[L. A. No. 16480.   In Bank.—August 17, 1939.]

VELNA L. TEATER et al., Appellants, v. GOOD HOPE DEVELOPMENT CORPORATION (a Corporation) et al., Respondents.

Newby & Newby, Dee Holder and Nathan Newby for Appellants.

Best & Best and Eugene Best for Respondents.

THE COURT.—The appeal in this case was originally heard by the Fourth District Court of Appeal. Following a decision by that court, a petition for hearing by this court was granted. Consideration of the several points of law that have been presented by the respective parties to the litigation has resulted in a conclusion that the appeal was correctly decided by the District Court of Appeal. Its opinion rendered therein, which was prepared by Mr. Justice Griffin of that court, is therefore adopted by this court as its own. It is as follows:

"Velna L. Teater was the owner of certain real property known as the 'Good Hope Mine' situated in the county of Riverside. M. M. Teater is the husband of Velna L. Teater. On June 1, 1933, these appellants, as husband and wife, entered into a written contract for the conditional sale of this property to Clifford H. Marker. This contract was duly recorded September 13, 1934. Under its terms, among other things, it was provided that Marker should pay to appellants for this property the sum of $55,000, payable $3,500 upon the execution of the contract and the balance in specified monthly instalments; that title to the property should remain in Mrs. Teater until the full purchase price should be paid, at which time she would be required to deed the property to Marker. A given percentage of all ore was to be reserved to the seller, together with a 10 per cent royalty. Marker was to have posses-

sion of the property and retain it so long as he should 'fully perform each, every and all the terms, covenants and conditions of the within contract'. It was further provided that he should pay all bills and prevent any and all liens of mechanics and materialmen from being filed against the property; that time should be the essence of the agreement, and upon the violation of any of the covenants or conditions of the contract it should, at the option of the seller, terminate; that upon such violation the seller should be released from all obligations in law and equity, to convey the property, and the property *and the appurtenances, and all buildings and other improvements shall become forfeited to second parties';* that 30 days' notice should be given to Marker of the sellers' intention to exercise the option to terminate; that he should, upon the termination of the contract for 'any cause' execute and deliver to seller, Velna L. Teater, a quitclaim deed; and deliver to her quiet and peaceable possession of the premises. Paragraph 15 of the contract provides that upon its termination, *'all machinery and tools and other unattached and movable equipment* which may be placed upon said premises by first party may be removed therefrom within forty-five days after the termination of the within agreement, provided, however, that no such tools or machinery shall be removed while first party may be in any manner indebted to second parties for past instalments due under the obligation of the within contract, and such machinery and equipment shall be deemed security for the payment of such instalments'.

"After execution of the contract Marker entered into possession of the premises. Thereafter the contract was assigned to respondent Good Hope Development Corporation (hereinafter referred to as the Development Corporation), which proceeded to attempt the mining of the property and the performance of the terms of the contract. The assignment of this contract was followed by a period of expansive and expensive development which resulted in placing on the property by the corporation of certain improvements, buildings, machinery and equipment. In the year between June, 1933, and June, 1934, the respondent Dill Lumber Company furnished certain lumber and materials to the Development Corporation and at different times the respondent Bank of Perris loaned money to it. At the time of the assignment and

subsequent thereto, Marker was the secretary of the Development Corporation.

"On July 1, 1935, an instalment of the purchase price in the amount of $5,000 became due and payable and the purchasers were unable to make this payment. On July 3, 1935, appellant Mrs. Teater served respondents Marker and the Development Corporation with notice to pay this instalment within 30 days or she would terminate the contract if the payment was not made.

"On August 1, 1935, the respondent Development Corporation filed in the superior court of Riverside county a petition under the California State Moratorium Act (Stats. 1935, p. 1208). A hearing was had upon the petition and on November 14, 1935, that court made an order granting it nine months' extension of time to make the instalment payments on the purchase price under the contract.

"Under the terms of this order the Development Corporation was permitted to remain in possession of the property and to mine it in a certain way and appellants were prevented from taking possession of the property or terminating the contract, 'while said petitioners are complying with the terms and conditions of this order, and until the further order of this court, but in no event *not later* than February 1, 1937'. Respondent Development Corporation was also required to pay to appellants $250 per month upon the instalments of the purchase price, 8 per cent interest upon the unpaid instalments and an 8 per cent royalty. The purchasing parties remained in possession of the property, by virtue of this order, until June 30, 1936.

"While in possession of the property under this order, the purchasers failed to comply with its conditions and terms in many respects. They failed to pay appellants the monthly instalments of $250 for all months subsequent to March, 1936. They failed to pay the royalties due for the months of May, June, and July, 1936. They failed to pay their laboring men and in June, 1936, were indebted to them in the sum of $900. Marker advised the unpaid laborers to file claims for liens against the property, which they did. The Development Corporation ceased actual work on the mine by June 11, 1936. On June 18, 1936, the purchaser was indebted to appellants under the terms of the contract (but not under the court order) in an amount in excess of $18,000 for instalments past

due, and about $400 for royalties which they failed to pay over to appellants. On June 18, 1936, there was located on the premises a building, certain machinery, and equipment consisting in general of a mill erected upon the property by the purchaser and his assignee, together with the necessary machinery and equipment used in milling the ore obtained from the property.

"Plaintiffs and appellants in their complaint allege that they are entitled to the possession of the following described property and seek return thereof: 'windows from corrugated iron mill building, 1 jaw crusher—14 in., 1 conveyor belt— 14"—200 ft., 1 marathon rod mill—4 x 8, 1 feeder and ½ HP motor, 9 amalgamation plates, 1 classifier, 1 Torster-flotation bell, 1 Plato concentrator, 1 flotation blower, 1 regrind barrel, 1 reagent feeder, 1 25–HP motor, 2 5–HP motor, 1 50–HP motor, 3 3–HP motor, 1 motor for regrind barrel, 2 15–HP motors in supply house, all machinery belts and pulleys, 1 electric hoist and cable, 1 Ingersoll-Rand compressor, 3 ore lears, 1 skip, 2 Denver hammers, 1 Cochise-stoper, 1 Cameron pump, 1 Ingersol-Rand motor pump, 1 American centrifugal pump, 1 circular saw and mantle and motor, 1 7½ HP motor on reservoir, 1 15–HP motor in mine, 1 40 HP motor on compressor, 1 Auto-Car dump truck, 1 Kissel truck ⅞ in. drill steel, shovels, picks, around 1200 ft. of track, estimate of about 1500 ft. of 1 in.—1½ in.—2 in.—2 in.—2½ in. and 2 in. pipe, 1 blacksmith shop, complete; following from assay office: 1 pr. button balances, 1 pr. pulp balances, 1 steel safe, 1 assay furnace, 1 Braun pulverizer, 1 jaw crusher, 1 muffle burner, 1 2 or 3 HP motor and belt, 3 tables, cooking utensils, dishes, 1 General Electric refrigerator, 6 steel cots and mattresses, 1 3-burner coal-oil stove, 2 tables, 2 benches, . . . ' (The method of the affixation of this machinery and equipment will be discussed later.)

"All of respondents, by their various answers, admit that the sheriff, Carl Rayburn, by virtue of the writ of attachment, took into his possession on June 24, 1936, the property 'described in plaintiff's complaint' and 'sold the same' under the writ of execution to the Dill Lumber Company, which now has possession thereof; that at the time of the taking, the Good Hope Development Corporation was in possession of said property.

"Commencing on June 18, 1936, and continuing over the week-end holidays, the above-described equipment was claimed to have been removed from the premises by direction of Mr. Marker and stored in warehouses in the town of Perris for the Development Corporation. These warehouses were under the control of the Bank of Perris. There is a dispute as to the reason for the removal of the property. Marker testified that he was fearful that the equipment might be stolen while the mine was shut down; that he discussed the matter of the removal of the machinery with Teater.

"Appellants claim that they had no notice that the equipment was to be removed from the mining property. Removal of these fixtures and equipment was completed on Sunday, June 21, 1936. On the evening of this day Mr. Teater claims that by chance he visited the mining premises and saw the last of the machinery being removed and that he registered an objection with the person hauling the same away and was told that the only thing that could stop the removal would be a court order. On June 22, 1936, Mr. Teater and one of his attorneys went to look for the machinery and upon inquiry of a Mr. Stewart, president of the respondent bank, they were told that he (Stewart) had arranged to pay the man for the work in removing the machinery to his warehouses. Stewart, however, denies such arrangement at the time stated. Teater then informed Stewart that the contract between Marker and Mrs. Teater prohibited the severance and removal of the machinery and that the removal thereof was wrongful.

"On June 23, 1936, an action was commenced in the name of the Dill Lumber Company against the Good Hope Development Corporation wherein the plaintiff sought to recover, in its first cause of action, the sum of $773.68 for materials supplied to Marker, James M. Hyde and Fred E. Keller, between the dates of July 22, 1933, and June 21, 1934. In its second cause of action it sought to recover the sum of $2,400 upon the note of the Development Corporation, assigned to it by the respondent Bank of Perris. In its third cause of action it sought to recover the sum of $1,450, on account of a bill for legal services claimed to have been rendered to the Development Corporation by Alford P. Olmstead and assigned to the Dill Lumber Company by said attorney. It is to be noted that Mr. Olmstead was attorney for the Development Corporation and Mr. Marker during the transactions

related. A fourth cause of action sought recovery of the sum of $100, being a bill for legal services claimed to have been rendered by the respondent Eugene Best, which bill was also assigned to the plaintiff in said action. Best made this charge for representing the Development Corporation in the moratorium proceedings wherein the contract of purchase above mentioned was thoroughly discussed. As a fifth cause of action the plaintiff sought to recover the sum of $2,633.42 for an alleged debt owing from the Development Corporation to Maude C. Marker, the mother of respondent Clifford H. Marker. On June 23, 1936, a writ of attachment was, at the direction of Mr. Best, attorney for the Dill Lumber Company, issued in that action and levied upon the machinery stored in the warehouses. The defendant Development Corporation filed no answer to the complaint but permitted its default to be taken and a judgment entered in the action for the full amount claimed in the prayer. No third party claim was filed by appellants but on June 27, 1936, the respondents Marker, Good Hope Development Corporation, Dill Lumber Company, Best, Olmstead, Mrs. Maude Marker and the Bank of Perris were notified in writing of the claim of the appellants that the removal of the machinery from the mining property was wrongful and a demand was made upon each of them to return the machinery or relinquish their claims thereto.

"On July 11, 1936, an execution sale was held at the direction of Mr. Best, upon the default judgment and the property was purchased at the execution sale by the Dill Lumber Company. Best, Olmstead and Marker attended the sale.

"Mr. Stewart of the Bank of Perris testified that no consideration was paid by the Dill Lumber Company for the note, but that it was understood in reference to the assigned claims that if the attachment was made, the Lumber Company would sell the machinery and divide the proceeds among the various claimants named in the attachment suit.

"On July 17, 1936, the appellants notified the Development Corporation and Marker that they were in default under the contract of purchase and demanded a performance thereof within 30 days or, upon failure to perform, a forfeiture of the contract. Those respondents failed to comply with the terms of the contract and on August 24, 1936, they were served with formal notice of the forfeiture. At the time this

last notice was served, the nine months' period of extension granted by the moratorium order had expired.

"On June 30, 1936, appellants filed this action alleging generally that they were the owners and entitled to the possession of the property described and that the defendants wrongfully and without right 'severed from said real property and removed therefrom all of said property'; that all of them were in wrongful possession of the property and were detaining the possession of it against the will of plaintiffs who were entitled to a return of the property or in lieu thereof, damages, both compensatory and exemplary.

"The respondents answered and denied generally and specifically the allegations of the complaint, except as hereinafter mentioned. Respondent Dill Lumber Company filed a cross-complaint to quiet title to the property sold under the attachment proceeding.

"The trial court found that 'It is not true that said property (fixtures) or any part or portion thereof is now or ever was affixed to the real property known as the Good Hope Mine hereinbefore described, so as to become a part thereof.'

"Appellant attacks this finding and claims that it is not supported by and is contrary to the evidence.

"There is some conflict as to the facts in reference to the manner of affixation and the uses to which the various articles were put. The witness Marker testified generally that the mill was placed in a rather substantial mill house that was built over it afterwards; that the building had certain mud sills on top of an old stone wall, certain mud sills on the ground, and that the building built thereon was just framework of 2 x 4's; that in the center of the building there were some 8 by 8 posts; that the building was covered with a corrugated iron roof and corrugated iron sides and had windows in it; that the dimensions of the building were 60 x 70 feet and about 8 to 10 feet in height; that the rod mill was composed of about three fixed parts and about a half dozen moving parts; that there was a base upon which the other fixed parts sat and the base sat upon the top of a concrete block 10 by 15 feet in dimensions and about 8 feet deep; that the mill was fastened to these cement blocks by bolts and nuts; that the mill was placed there originally to mill certain values out of the dump of the Good Hope Mine, and afterwards they milled whatever ore

there was in the mine to mill; that a 60-cycle, 3-phase, 440-volt electric motor drove the mill and it sat upon a block on top of the floor; that all the other machinery in the millhouse was affixed differently; that the concentrating table was set upon some rocking arms that were set upon three little concrete pillars; that the amalgamation plates rested upon wooden tables, the legs of which were nailed to the platform; that the tables were pretty heavy; and that the blower sat on a little concrete block about 2½ by 3 feet and one-foot thick, and it was bolted to the little block.

"One witness testified that all of the machinery in the millhouse constituted a connected and interrelated milling system and that if one machine was taken out, such as the table or plates, the whole mill would be shut down, because the values would be gone; that it was an entire operating unit.

"The witness Marker testified that there was no relationship between the various parts that were removed and that they were in no way fastened one to the other.

"The trial court, after hearing the evidence, made certain additional findings, i. e., (1) that the plaintiffs were not at any time the owners of or entitled to the possession of the property described in their complaint; (2) that a portion of the property was used in working and developing the mine; (3) that none of the defendants ever took possession of the property except as heretofore related by them; (4) that since the 11th day of July, 1936, the Dill Lumber Company has been in possession of *said* property; (5) that plaintiffs, prior to the commencement of this action, never demanded that respondents deliver the property to them; (6) that no part or portion of the property was ever affixed to the real property or severed therefrom; (7) that plaintiffs were not in possession of the real property at the time of the commencement of this action, but the Development Corporation and C. H. Marker were. The court then found that the Dill Lumber Company was the owner of and entitled to the possession of the following described property which was removed from the mining premises:

" '1 Jaw crusher—14 in.
1 Conveyor belt—14″–200 ft.
1 Marathon rod mill—4 x 8
1 Feeder and ½ HP motor
9 Amalgamation plates

1 Classifier
1. Torster-flotation bell
1. Plate concentrator
1 Flotation blower
1 Regrind barrel
1 Reagent feeder
1. Ingersoll-Rand motor pump
1 Circular saw and mantel and motor
1 40 HP motor compressor
1 Braun pulverizer
1 Muffle burner
1 25 HP Motor—2 HP Motors
1 50 HP motor—3 3 HP motors
1 Motor for regrind barrel
2 Motors 15 HP
1 Electric Hoist and cable
1 Ingersoll-Rand compressor
3 Oar lears
1 Skip
2 Denver hammers
1 Cochise-Stoper
1 Cameron pump
1 American centrifugal pump
1 15 HP motor
1 Jaw crusher
Quantity of odds and ends, mining equipment
Odd lot of tools, shovels, and pipe, etc.'

And entered judgment quieting title to this property in the Dill Lumber Company, decreeing that appellants had no right, title or interest in any of the property. It is to be noted from a comparison that the list of equipment claimed and described in appellants' complaint and admitted by the answers to have been removed differs materially from the list of articles described in the decree. From the pleadings it would appear that the Dill Lumber Company is now in possession of many of the articles not mentioned therein, such as 'windows from the corrugated iron mill building', which clearly seems to have been a part of the realty; also one Kissel truck; one Autocar Dump; 1200 feet of track; 1500 feet of pipe; one steel safe; one blacksmith shop complete; one General Electric refrigerator; and many other items. However, the certificate of the sheriff received in evidence discloses a list

of articles taken by him under the writ of attachment and sold, which compares closely with the list of articles set forth in the decree. From a study of the record, which contains about 485 pages, we are able to discover that the Autocar Dump Truck was left with Mr. Bert Stewart, the Kissel Truck was not taken from the property, and the 1200 feet of track was left at the mine, as well as the ore cars and skip, most of the pipe, some of the blacksmith shop equipment, a table, six steel cots and bedding and boarding house equipment. The General Electric refrigerator was left in Elsinore.

■ "The real property involved in this action was mining property. Where this is the case, the machinery which is used in working or developing the mine is deemed to be affixed to the mine. (*Malone* v. *Big Flat Gravel Min. Co.*, 76 Cal. 578, at p. 583 [18 Pac. 772]; Civ. Code, secs. 660 and 661.) Articles annexed or structures erected by a purchaser of land who is in possession by virtue of his contract of purchase but who has not yet obtained title to the premises, cannot ordinarily be removed by him without the consent of the vendor, the presumption being, from his interest under the contract and expectation of acquiring absolute title, that he intended the structures or articles to be a part of the land. (*Pomeroy* v. *Bell*, 118 Cal. 635, at p. 638 [50 Pac. 683]; 26 Cor. Jur. 675, sec. 36; *Lavenson* v. *Standard Soap Co.*, 80 Cal. 245, at p. 250 [22 Pac. 184, 13 Am. St. Rep. 147]; *Oakley Co.* v. *Butler*, 15 Cal. App. (2d) 572 [59 Pac. (2d) 826].)

■ "There is an exception to the rule specified in sections 660 and 661 of the Civil Code which may be thus stated: that the parties themselves may, in their dealings with chattels annexed to or used in connection with real estate, fix upon them whatever character, as realty or as personalty, they desire and the courts will give to the property the character which the parties themselves have fixed upon. (*Miller* v. *Struven*, 63 Cal. App. 128 [218 Pac. 287]; *Fratt* v. *Whittier*, 58 Cal. 126 [41 Am. Rep. 251].)

"Under paragraph 13 of the conditional sales contract we find this language: 'It is agreed . . . upon the violation of any of the covenants and/or conditions herein contained, the same shall, at the option of the second parties (Teaters) terminate . . . and said premises . . . *and the appurtenances,* and *all buildings and other improvements* shall become forfeited to second parties . . . provided, however, that second parties

shall not exercise the within option until they have given to first party (Marker) (30) days' written notice to cure his default . . . '

"The other provision in the contract relating to the purchaser's rights may be found in paragraph 15, which in part provides as follows: 'It is mutually understood and agreed that upon the termination of the within agreement, for any reason whatever, that *all machinery* and *tools and other unattached* and *movable equipment* which may be placed upon said premises by first party may be removed therefrom within forty-five days after the termination of the within agreement. Provided, however, that no such tools or machinery shall be removed while first party may be in any manner indebted to second parties for past instalments due under the .obligation of the within contract, and *such machinery and equipment shall be deemed security for the payment of such instalments.'*

"It was to be anticipated from a fair construction of this entire agreement, that certain appurtenances, buildings and other improvements would, under sections 660 and 661 of the Civil Code, become fixtures to the real property, and that there would be certain other machinery and tools that were movable and unattached that would not of necessity become a part of the realty.

"Property constituting fixtures to the land belongs to the vendor in case the purchaser subsequently defaults in his contract, and he has no right at any time to remove it, and no creditor has any greater right. (*Conde* v. *Sweeney,* 14 Cal. App. 20 [110 Pac. 973]; *Pomeroy* v. *Bell, supra; Chowchilla Colonization Co.* v. *Thompson,* 39 Cal. App. 517 [179 Pac. 411]; *In re Potee Brick Co. of Baltimore City,* 179 Fed. 525, 528; Ewell, Fixtures (2d) p. 73, sec. 49.) Where a fixture annexed to a freehold is tortiously severed, the owner of the realty, at his option, may treat the fixture as personalty and recover the same by the action of replevin. (Bronson, Fixtures, p. 380, sec. 1106.) The right to the immediate possession of this property by the vendor was created by the act of the vendee. (*Leonard* v. *Stickney,* 131 Mass. 541.)

"Appellants' action in this case was one of replevin and, of course, the essential prerequisite to such an action is the right to the immediate and exclusive possession of the property at the time of the commencement of the action (*Freder-*

*icks* v. *Tracy,* 98 Cal. 658 [33 Pac. 750]) and hence, if there be any preliminary act or condition precedent to be performed before the unqualified right of possession attaches the action cannot be maintained, and an after-acquired interest will not support replevin. (*People's Savings Bank of Fresno* v. *Jones,* 114 Cal. 422 [46 Pac. 278]; 5 Cal. Jur. 160, sec. 4.) It must be conceded that on the date of the commencement of this action Mrs. Teater was the owner of the Good Hope Mine (the real estate) subject to the contract of sale to the Development Corporation; that certain payments under the terms of that contract were in default but no forfeiture had been declared and that the appellants were enjoined from declaring such forfeiture. It must be conceded further that the Development Corporation purchased the personal property here in controversy and originally was its owner. Therefore, unless the title and ownership thereto were lost or encumbered between the date of its purchase in 1933 and the sale under the levy of the attachment by the Dill Lumber Company in 1936, the findings of the trial court on the cross-complaint must be upheld.

██ "The main question then presented to the trial court was whether the act of locating the machinery on the mine and using it in and about its development amounted to an absolute transfer of title and change of ownership or whether the transaction amounted merely to the giving of security on personal property.

"It is the general rule that where the purpose and effect of the transaction is to create a lien on specific property as security for the payment of a debt it constitutes a mortgage, irrespective of the language used by the parties. (*Ferguson* v. *Murphy,* 117 Cal. 134 [48 Pac. 1018]; 5 Cal. Jur., p. 44, sec. 5; 5 R. C. L., p. 384.) The rule is well stated in *Sterman* v. *Ziem,* 17 Cal. App. (2d) 414, 418, 419 [62 Pac. (2d) 160], where it was held that a chattel mortgage does not transfer title to the mortgaged property and that the mortgagee has only a lien thereon as security for the payment of the debt. Even though the parties agree to the contrary, yet where the relation of the parties is that of debtor and creditor and the property is regarded as security for the payment of the debt, there is no transfer of title. A mortgage ordinarily does not entitle the mortgagee to the possession of the property unless authorized by the express terms of the mortgage (sec.

2927, Civ. Code; 5 Cal. Jur. 117), with some possible exceptions. (*Summerville* v. *Stockton Milling Co.,* 142 Cal. 529 [76 Pac. 243]; *Bank of Ukiah* v. *Moore,* 106 Cal. 673 [39 Pac. 1071]; *Wixom* v. *Davis,* 57 Cal. App. 620 [207 Pac. 694].)

"It seems clear that the placing of *all machinery and tools and other unattached and movable equipment* upon the premises was to be considered as additional security for the overdue instalments of the purchase price in the face of the language of the contract between the parties.

■ "The question now presents itself: Would the tools, machinery and equipment removed come under and be classified by the second provision of the contract or were they a part of the realty? When the construction given an instrument by a trial court appears to be reasonable and consistent with the intent of a party, appellate courts will not substitute another interpretation though it seems equally tenable. (*Kautz* v. *Zurich Gen. A. & L. Ins. Co.,* 212 Cal. 576, 582 [300 Pac. 34]; *Estate of Boyd,* 24 Cal. App. (2d) 287 [74 Pac. (2d) 1049].)

"It is quite evident from the record that the Teaters considered the equipment described to be mortgaged for the payment of delinquent instalments due, and were quite satisfied to allow the development corporation to remove it if the instalments were paid.

"We have carefully examined the entire record as to the manner of affixation of the various parts of the machinery described, and as to a great portion of it there seems to be little doubt as to the correctness of the court's finding. As to other portions (although the record is very confusing) there may be some question. It is quite apparent to us that the windows at least, which were removed from the corrugated iron mill building, were a part of the realty notwithstanding the finding of the trial court. This being so, the appellants, under the case of *Chowchilla Colonization Co.* v. *Thompson, supra,* would have the right of possession as to this property. Under the present state of the pleadings and the evidence before us we are unable to determine in whose possession the balance of the property not described in the decree may be found.

■ "Section 2957 of the Civil Code, as it existed in 1933, on the date of the execution of the contract of purchase, provided:

" 'A mortgage of personal property is void as against creditors of the mortgagor and subsequent purchasers and encumbrancers of the property in good faith and for value, unless:

" '1. It is accompanied by the affidavit of all the parties thereto that it is made in good faith and without any design to hinder, delay, or defraud creditors;

" '2. It is acknowledged or proved, certified, and recorded in like manner as grants of real property.'

"This section is modified by section 2973 of the Civil Code, making such an instrument valid between the maker and persons who, thereafter parting with value, have actual notice thereof. It is apparent that appellants have not complied with sections 2957 and 2973 of the Civil Code. Therefore the mortgage is valid between the parties and persons who, before parting with value, have actual notice thereof. The trial court has failed to find on this issue. It was held in *Stewart* v. *Leasure,* 12 Cal. App. (2d) 652 [55 Pac. (2d) 917], that where a lease provides that the landlord shall be the owner of all crops until the rent has been paid, the agreement must be construed as intending to give security to the landlord for the rental and to create a lien upon the crops, and that it was an attempt to obtain the advantages of a chattel mortgage without complying with the provisions of the statute upon the subject. In our opinion, the instant contract, in referring to the machinery and tools and other unattached and movable equipment, should be subject to the same rule of construction, *viz.,* that as between the parties and subsequent purchasers with notice, appellants had a lien upon the property but were not the absolute owners of the same and could not become so until they took the necessary steps to foreclose such lien. (*Stewart* v. *Leasure, supra*; *Ronning* v. *Way,* 18 Cal. App. 527 [123 Pac. 615].) ■ There is considerable evidence in the record that would support the finding that the Dill Lumber Company, or at least some of the assignors of its various claims, had notice of the provisions of the contract of purchase. It therefore becomes material to the issue presented to determine this fact in support of the judgment quieting title to the property involved. (*Tomlinson* v. *Ayres,* 117 Cal. 568 [49 Pac. 717]; *Douglass* v. *Willard,* 129 Cal. 38 [61 Pac. 572]; *Ronning* v. *Way, supra*; 5 Cal. Jur., p. 50, sec. 9.)

"If the evidence of notice of the lien of appellants on the personal property would support a finding of lack of notice of appellants' lien at the time respondent parted with value, and if such a finding were made, then the judgment rendered on the cross-complaint could be supported. Such finding would leave undetermined the right of possession and ownership of the property described in the complaint, which may have been a part of the realty and which is not described in the cross-complaint nor in the judgment. The evidence shows rather conclusively that the admission in the answers that the sheriff took possession of all of the property is not correct. It is not clear what became of the property not described in the judgment. If the sheriff still has possession of some of it, the trial court should make some proper finding concerning it. This is also true if possession is in the Dill Lumber Company or the Development Corporation. Because of this uncertainty, the judgment in favor of these respondents cannot be affirmed. As to the judgment on the cross-complaint in favor of the Dill Lumber Company, there also remains for determination the question of notice of the lien of appellants before this respondent parted with value, and also whether it did in fact part with value. (Sec. 2973, Civ. Code.)

"Certain respondents admittedly did not have possession of any of the property, a necessary prerequisite in a replevin action. Therefore the judgment in favor of those respondents, namely, Bank of Perris, C. R. Stewart, sued under the name of H. G. Stewart, C. H. Marker, James H. Hyde, Maude C. Marker, Eugene Best and Alford P. Olmstead is affirmed. As to the Dill Lumber Company, a corporation, Carl Reyburn, sheriff of Riverside county, and the Good Hope Development Corporation, the judgment is reversed with instructions to the trial court to take further evidence, if necessary, to allow an amendment of the pleadings to conform to the proof and make the necessary finding on the issue of notice of the appellants' lien, value parted with, if any, by cross-complainant, and determine what property described in the complaint was affixed to the realty, which was not described in the judgment, and enter judgment consistent with the findings and the views herein expressed."