BENJAMIN B. AND DOROTHY J. SMITH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Smith v. Commissioner
Docket Nos. 1084-70, 7446-72
United States Tax Court
T.C. Memo 1974-195; 1974 Tax Ct. Memo LEXIS 128; 33 T.C.M. (CCH) 842; T.C.M. (RIA) 74195; July 29, 1974, Filed. Earl C. Crouter and Jack A. Cozy, for the petitioners. Jonathan A. Brod and Marion Malone, for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined deficiencies in petitioners' Federal income taxes as follows: Year
Deficiency 1962
$ 16,886.14
1963
24,397.67
1964
1. 89,991.16
1965
24,433.34
1966
36,644.02
1967
12,959.93
TOTAL
$205,312.26
The only issues remaining for decision are: *129 1. Whether petitioners received rent in the form of photographic developing machinery in 1964 upon termination of a lease with Houston-Hale, Inc. and, if so, how much. 2. The fair market value of certain photographic developing machinery and other related assets in 1965 when petitioners donated such machinery and assets to Moral Rearmament, Inc. 3. The fair market value of furniture, equipment and inventory in 1966 when petitioners donated them to Opportunities Industrialization Center, Inc.
FINDINGS OF FACT General Facts Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife, resided in Los Angeles, California when they filed their petitions herein. They filed joint Federal income tax returns for the years in issue with the district director of internal revenue at Los Angeles. Hereinafter, Benjamin B. Smith, the husband, is referred to as "petitioner." I Rental Income In 1962 petitioner owned the land and building located at 230 West Olive Avenue, Burbank, California. By lease dated May 1, 1962, petitioner leased the land and building to Houston-Hale, Inc. (hereinafter "Houston-Hale") a California corporation. Houston-Hale *130 operated a motion picture film processing laboratory on the presmises. The lease was for a twelve-year term at a total rental of $252,600, payable $1,500 a month from May of 1962 to March of 1964, and $1,800 per month thereafter. In the lease the lessor (petitioner) agreed that the laboratory equipment listed in Appendix A to the lease "is presently installed in the leased premises and is, has been and shall remain the separate property of the Lessee and that the Lessor shall have no right, interest or ownership in any of said equipment or any modifications or alterations which the Lessee may from time to time make to said equipment during the term of the lease." The items listed in Appendix A consisted of the following: 1. 16mm Reversal Color Developing Machine Locally designed and built Ansco processing reversal color developing machine. 2. 35mm Reversal Color Developing Machine Locally designed and rebuilt Ansco processing 35mm reversing color developing machine. 3. 35mm Negative Developing Machine Locally designed and built Ansco processor negative machine. 4. 35mm Positive Developing Machine Locally designed and built Ansco processing 35mm color positive *131 developing machine. 5. 35mm Positive Developing Machine Locally designed and built Ansco processing 35mm color positive developing machine. 6. Air Compressor A Gardner-Denver 10 x 12 x 5 x 12, 225 r.p.m., 600 pressure single cylinder, water cooled air compressor, "L-59727 with 48", straight grooved drive, fly wheel with a V drive and pulley, fly wheel and guard, rebuilt 1952 with carbon rings. 7. Air Compressor This is a Gardner-Denver P-12-AM 300 r.p.m. 100 # pressure 12 x 11" carbon ring and piston, horizontal, water cooled, air cooled air compressor #171125 with 56" drive pulley 5-DV drive from 50 h.p., 1200 r.p.m., U.S. Motor #936221 with 14" five-drive pulley and base with guards.
8. Air Compressor Nash Engineering Co. "Hytor" size AL1623, test F1087, 3452 r.p.m., air compressor, rotary type with direct connected 20 h.p., 3600 r.p.m. Sterling motor #34698 with integral steel base, filter unit. The lessee (Houston-Hale) agreed that other equipment listed in Appendix B to the lease "shall be deemed for all purposes to be merged in the building and to be and become a part of the realty; is, has been and shall remain the separate property of the Lessor and the *132 Lessee shall have no right, interest or ownership in any of said equipment." To secure payment of the rent and performance of all other obligations under the lease, the lessee agreed to execute and deliver to the lessor a chattel mortgage in favor of the lessor on its property referred to in Appendix A, including any additions or improvements thereto. Houston-Hale did execute and deliver to petitioner such a chattel mortgage dated July 18, 1962. In March of 1964, Houston-Hale failed to pay the $1,800 rental when due. By letter dated March 11, 1964, petitioner demanded payment of the rent. Without making payment, on March 27, 1964, Houston-Hale filed a voluntary petition in bankruptcy in the United States District Court for the Southern District of California. Petitioner's attorneys negotiated a compromise with the Trustee in Bankruptcy whereby it was agreed that petitioner would waive any claims under the lease and administrative rent owing by the Trustee in exchange for "all right, title and interest in and to the items covered by the July 18, 1962 chattel mortgage given as security for the lease." The administrative rent related to the period the Trustee was in possession *133 of the land and building. On June 18, 1964 the Trustee filed an Application for Authority to Compromise Controversies with the District Court, in which he alleged that he believed the value of the mortgaged property was less than the bankrupt's liability under the lease. On July 10, 1964, the District Court approved the compromise. On July 31, 1964 the Trustee executed a Bill of Sale transferring title to the mortgaged property to petitioner. In the statutory notice of deficiency for 1964 respondent determined that the mortgaged property had a fair market value of $100,000 when the Trustee transferred it to petitioner and that it constituted income in the nature of rent. By amended answer filed at the conclusion of the trial, respondent alleged that the mortgaged property had a fair market value of $386,875.35, instead of $100,000, when transferred to petitioner, and that that amount was income in the nature of rent. The fair market value of the mortgaged property when the Trustee transferred it to petitioner was $30,000. II Fair Market Value of Property Donated to Moral Rearmament in 1965 On May 28, 1965, petitioner gave The Oxford Group - Moral Rearmament, MRA, Inc., *134 (hereinafter "Moral Rearmament") the photographic developing machines and the air compressors which had been transferred to him by the Trustee in Bankruptcy, together with their accessory equipment such as tanks, filters and pumps. On petitioners' 1965 return they claimed a charitable deduction of $381,225 for this gift. Respondent disallowed $354,408 of the claimed deduction on the grounds that petitioners had not shown that the property was worth more than $26,817. On June 10, 1965, petitioner gave to Moral Rearmament a film vault and various related equipment. On their 1965 return petitioner claimed a charitable deduction of $7,200 for the film vault and $5,650.35 for the related equipment. Respondent disallowed the full amount ascribed to the film vault and $4,900.35 of the value assigned to the related equipment on the grounds that petitioners had not shown that the film vault had any value or that the related equipment was worth more than $750. The fair market value of the property petitioners donated to Moral Rearmament on May 28, 1965 was $26,817, and the fair market value of the property petitioners donated to Moral Rearmament on June 10, 1965 was $750. III Fair *135 Market Value of Property Donated to Opportunities Industrialization Center, Inc. in 1966 During 1965 and 1966 petitioner owned rental property located at 5245 San Fernando Road West, Los Angeles, California, which was rented to United Delta Corp. (hereinafter "United Delta"), an aircraft and electrical tools industries supplier. United Delta's inventory, furniture and equipment were subject to liens held by A.J. Armstrong Co., Inc., New York Terminal Warehouse Co., Inc. and petitioner. In 1965 United Delta was in default on its rental payments to petitioner. Petitioner obtained a judgment against United Delta for unpaid rents and pursuant to the judgment, the Marshal of the Los Angeles Municipal Court levied upon all of United Delta's personal property located at 5245 San Fernando Road West. The Marshal held a sale of United Delta's personal property on January 18, 1966, at which petitioner was the only bidder. Petitioner purchased United Delta's office machines, four steel cabinets, chairs, desks and other personal property for $50, and four desks, five chairs, one cabinet, five rolls of steel wire and all other personal property of United Delta (including inventory and miscellaneous *136 electronic equipment) for $150. On December 27, 1965, A.J. Armstrong Co., Inc. advised petitioner it would not exercise its prior liens against United Delta's inventory, furniture and equipment because its lien did not appear "to have any substantial value." On January 24, 1966, New York Terminal Warehouse Co., Inc. advised petitioner that it was abandoning and waiving all its claims or liens against United Delta's personal property. In April 1966 petitioner gave the United Delta property it had purchased at the Marshal's sale, together with some draperies from his home and other office equipment he had accumulated over a period of time, to Opportunities Industrialization Center (hereinafter "OIC"), a charitable and educational job training center whose major programs consisted of training unskilled workers in Los Angeles. OIC was funded by three government agencies: Department of Labor, Department of Health, Education and Welfare, and the Office of Equal Opportunity. To qualify for governmental cash funding, OIC was required to solicit "in kind" contributions from industry in an amount equal to at least 10 percent of its governmental cash funding. In 1966 OIC needed to solicit *137 from industry 10 percent of $3,000,000 (or $300,000) of "in kind" contributions. OIC made its own appraisal of the "in kind" property it received from industry. OIC maintained two accounts to record "in kind" contributions, a capital account for contributions of capital assets and an inventory account for contributions of expendable materials and supplies. When OIC received capital property, it entered the appraised value of the property in its capital account. It then received credit with the government funding agencies for the full appraised value of the capital property it received. When OIC received inventory, such property was classified, inventoried and entered into its inventory account. As the expendable materials were consumed in the training programs, OIC received credit for the amount consumed. OIC appraised the capital property (furniture and fixtures) it received from petitioner at $5,000. Because OIC never established an electro-mechanical program, OIC never received any funding credit for the inventory. On their 1966 Federal income tax return, petitioners claimed a charitable deduction of $4,396 for the furniture and equipment donated to OIC and $127,005.52 *138 for the donated inventory. Respondent determined that petitioners were entitled to a charitable deduction of $200 for the furniture, equipment and inventory. On brief respondent conceded that petitioners were entitled to a charitable deduction of $5,000 for the furniture and equipment donated to OIC. The fair market value of the furniture, equipment and inventory donated to OIC in 1966 was $10,000. OPINION I. Rental Income. Respondent contends that the property received from the Trustee in Bankruptcy in 1964 in compromise of petitioner's claims under the lease and chattel mortgage was income in the nature of rent. Petitioner asserts that he did not receive income in the nature of rent because (1) most of the property already belonged to petitioner, (2) petitioner's lien was tantamount to title, and (3) there was no rent or income in lieu of rent under section 109. [2] We agree with respondent. *139 Respondent further claims that the amount of income received as rent was $386,875.35, but we have found as a fact that the amount was only $30,000. There was considerable conflicting testimony, and many of the documents introduced into evidence also appeared to conflict with one another. This Court as the trier of fact has carefully considered the demeanor and credibility of the witnesses and has scrutinized the documents in evidence, and has made factual determinations conclusive of the first issue. The Court has concluded that, as set forth in the lease and chattel mortgage, and in accordance with the testimony of John Nicholas, a member of Houston-Hale's Board of Directors, and Fred C. Mehner, president of Houston-Hale, the lessee (Houston-Hale) owned the property leased in Appendix A to the lease and mortgaged it as security for its rental payments. Moreover, when the lessee failed to pay the rent it owed under the terms of the lease, and the Trustee compromised all petitioner's claims under the lease and chattel mortgage, and, in addition, against the Trustee for administrative rent, by transferring title to the mortgaged property listed in Appendix A to the lease to petitioner, *140 that property represented the payment of rent in kind. Rent, whether paid in cash or in kind, during the lease or upon termination of the lease, is income to the recipient. Section 61(a); section 1.61-8(b), Income Tax Regs. See Hort v. Commissioner, 313 U.S. 28 (1941). Petitioner's argument under section 109 that the mortgaged property represents improvements made by the lessee and obtained by the lessor (petitioner) at the termination of the lease, and that such improvements are not rent, fails in view of the Court's finding of fact that the mortgaged property represents rent paid in kind. Petitioner further argued that he, not the lessee, owned the mortgaged property as a matter of law because the property was affixed to the real estate. However, where the parties agree to treat certain chattels as the personal property of the lessee and not as fixtures beolonging to the lessor, those chattels are personal property. Jordan v. Reynolds, 108 Cal. App. 2d 91, 237 P.2d 1005 (1951); *141 Teater v. Good Hope Development Corporation, 14 Cal. 2d 196, 93 P.2d 112 (1939). In the lease the parties agreed that the property leased in Appendix A was the property of the lessee and that the property leased in Appendix B was the property of the lessor. The chattel mortgage also states that the property mortgaged (the same as that listed in Appendix A) is the property of the lessee-mortgagor. Petitioner also argued that execution of a chattel mortgage conferred ownership upon him. Clearly the chattel mortgage gave petitioner only a security interest in the mortgaged property. Sterman v. Ziem, 17 Cal. App. 2d 414, 62 P.2d 160 (1936). Having determined that petitioner received rent in kind on receipt of the mortgaged property, we must determine the amount of that rent. Petitioner's rental income equals the fair market value of the mortgaged property when transferred to him by Bill of Sale on July 31, 1964. Section 1.61-8(b), Income Tax Regs. In the statutory notice of deficiency, respondent determined that value to be $100,000. At the conclusion of the trial respondent, by amended answer, claimed that value to be $386,875.35. *142 The burden of proof as to the value of the mortgaged property in excess of $100,000 is upon respondent. Beck Chemical Equipment Corporation, 27 T.C. 840, 856 (1957); Stephen P. Hull, 18 B.T.A. 265 (1929); J. E. Robertson, 13 B.T.A. 550 (1928); Rule 142, Tax Court Rules of Practice and Procedure.
Petitioner, on the other hand, argues that the property could not have been worth over the $7,800 for past due and administrative rent which could have been claimed in bankruptcy. We give no weight to this contention because it ignores petitioner's lien on the property. The appraised value of the mortgaged property as of May 1, 1962 was $383,372.84 according to Appendix A to the lease. The Trustee in Bankruptcy valued the mortgaged property at $100,000. We were given no information how either the parties to the lease or the Trustee arrived at their valuations. The record indicates that Houston-Hale had the General Appraisal Company appraise the property in November 1962 for insurance purposes, but that appraisal was not introduced into evidence. General Appraisal Company performed another appraisal of the same property, together with accessory *143 equipment, as of May 21, 1965, and determined that the fair market value of the property at that time was $388,375. Respondent valued the property as of May 21, 1965 at $26,817. Valuation is not an exact science and the Court has not received much help from the parties with respect to the value of the mortgaged property as of July 31, 1964. We do know that Houston-Hale went bankrupt while operating with the plant in question, and that there was need for constant development and improvement work to be performed on the film developing machinery because of changes and improvements made in color film by film producers such as Eastman Kodak and Ansco. The record also raises unresolved questions concerning whether Houston-Hale properly maintained this machinery prior to going bankrupt. We also know that petitioner offered for sale, but was unable to sell, the equipment together with the building in which it was installed after he obtained title to the machinery, and that he finally gave the machinery to charity, which sold a few items for small amounts and has found no use or market for the remainder. Thereafter, petitioner sold his property at 230 West Olive Avenue to a purchaser *144 who demolished the one-purpose building which had held the film developing and processing equipment. The value of an income-producing plant is no greater than salvage if it cannot reasonably be expected to produce a profit as a going concern. The history of this plant does not militate in favor of a high valuation. After considering all the facts and circumstances the Court found as a fact that the mortgaged property had a fair market value of $30,000 on July 31, 1964. II. Fair Market Value of Property Donated to Moral Rearmament in 1965. Petitioner donated the foreclosed property along with accessory tanks, filters and pumps to Moral Rearmament on May 28, 1965, and claimed a $381,225 charitable deduction on his 1965 income tax return. The amount deducted was the value of those donated items according to an appraisal made as of May 21, 1965 by the General Appraisal Company. The appraisal was made on the assumption that the film processing laboratory was a going concern at its then location. In fact, the laboratory had not been in operation since Houston-Hale filed its petition in bankruptcy on March 27, 1964. Furthermore, an employee of General Appraisal Company testified *145 that the cost of removing the equipment from petitioner's building would be between $25,000 and $30,000, and the cost of installing it elsewhere would be between $50,000 and $60,000. At the time petitioner gave the film processing equipment to Moral Rearmament, it was contemplated by donor and donee that the equipment would be moved to Mackinac Island, Michigan. General Appraisal Company relied primarily on the cost-of-reproduction-less-accumulated-depreciation method in valuing the equipment because the Company knew of no comparable sales of a complete film processing laboratory. Although sales of individual developing machines were available, the machines in issue were not standard machines but had been specifically developed and designed for the West Olive Avenue laboratory. Respondent's valuation witnesses indicated that the film processing laboratory might well be too obsolete to be salable, that the equipment may have experienced more than normal wear and tear while Houston-Hale operated the laboratory, that during the period the machines were idle they corroded because film processing chemicals had not been thoroughly cleaned out of the equipment at shut-down and that *146 today most of the equipment was stored in an open yard and was not worth more than scrap. After considering all the evidence we have found as a fact that at the time petitioner donated the equipment to Moral Rearmament it was not worth more than $26,817, the amount respondent allowed petitioner as a charitable deduction. On June 10, 1965 petitioner gave to Moral Rearmament a film vault and various related equipment. General Appraisal Company valued the film vault at $7,200 and the related equipment at $5,650.35 and petitioner took a charitable deduction of said amounts on his 1965 income tax return. The respondent determined that the film vault had no value and the related equipment was worth no more than $750. The film vault was a small building approximately 10" 9" x 29" 6" x 11" high made of reinforced concrete with walls 4" to 6" thick. There was some question whether it was feasible to move it at all. One of petitioner's witnesses asserted it was feasible to remove it from its present location provided it was moved only a short distance. Moral Rearmament made no attempt to move the building; it abandoned it in place. We have found as a fact that the building had no *147 value when donated to Moral Rearmament. There is little evidence on the value of the related equipment. Considering carefully the evidence presented we have found as a fact that the related equipment had a fair market value when donated to Moral Rearmament of $750. III. Fair Market Value of Porperty Donated to OIC in 1966. Petitioner claimed a charitable deduction of $4,396 for furniture and equipment and $127,005.52 for inventory donated to OIC. Respondent has conceded that the furniture and equipment had a fair market value of $5,000 when donated. The issue to be determined is the fair market value of the inventory donated to OIC. The factors we considered in determining the value of the inventory were that petitioner purchased all the donated property, including the inventory, at a Marshal's sale for $200; that A.J. Armstrong Co., Inc. and New York Terminal Warehouse Co., Inc. both abandoned their liens against the donated property without consideration at petitioner's request; and that OIC never used the inventory and therefore never received any funding credit for the inventory. We also considered General Appraisal Company's appraisal of the property. With respect *148 to the inventory, the appraisers attempted to value the inventory at its retail price new. The inventory consisted of electronic components. The age and cost of the inventory was not clear. The appraisers appraising the inventory were not experienced in appraising such consumable supplies. Considering carefully all the evidence, we have found as a fact that the inventory had a fair market value of $5,000 on the date it was donated to OIC. Decision will be entered under Rule 155. Footnotes
1.. After trial respondent filed an amendment to his answer, increasing the 1964 deficiency to $307,002.67. ↩
2. SEC. 109. IMPROVEMENTS BY LESSEE ON LESSOR'S PROPERTY. Gross income does not include income (other than rent) derived by a lessor of real property on the termination of a lease, representing the value of such property attributable to buildings erected or other improvements made by the lessee. ↩