[Civ. No. 4538. Third Appellate District.—December 20, 1932.]

MABEL D. HILL et al., Appellants, v. GENERAL PE-TROLEUM CORPORATION (a Corporation) et al., Respondents.

Chandler, Wright & Ward for Appellants.

A. L. Weil and W. L. Appleford for Respondents.

TUTTLE, J., *pro tem.*—The purpose of this action is to have it adjudged that a certain restrictive covenant in an oil lease is inoperative and unenforceable and to remove said covenant as a cloud upon the title to real property belonging to plaintiffs.

The complaint contains seven counts. Demurrers were sustained to the last four counts, and upon failure to amend the cause was tried upon the first three counts. The trial court found for defendants upon the issues raised, and judgment was entered that plaintiff take nothing. The appeal is prosecuted from the judgment.

The only contention made upon this appeal is in respect to the sufficiency of the complaint, and the several causes of action therein set forth. The sufficiency of the evidence to support the findings is not questioned, nor is any ruling of the court upon matters of evidence attacked.

The plaintiffs entered into an oil and gas lease with defendant Midway Gas Company, on February 1, 1922, covering certain property in the Santa Fe Springs oil-fields in Los Angeles County.

The first cause of action is one to remove a cloud on the title to lands owned by plaintiff, described as lot 21, block 77, township of Santa Fe Springs, and included originally in said lease. It alleges the ownership of the lands by the plaintiffs, the execution of an oil and gas lease thereon by the plaintiffs in favor of the defendants, including a recital of the history of the transfer of the lease, and also alleges that the oil and gas lease contained, among other provisions, this language:

"Right of Oil Company to quitclaim.

"At any time or times after the date of this lease, the Oil Company may, at its option, execute and either deliver to the owner or cause to be recorded in the office of the county recorder of said county a quitclaim deed or deeds or other necessary legal instrument, duly acknowledged so as to be ready for recordation, quitclaiming all or any portion of the leased lands, as the Oil Company may select, and

upon the delivery or filing for record of any such deed the land so quitclaimed thereby shall forthwith be released from the effect of this lease, and none of the rights and obligations of the parties hereto shall thereafter apply to said quitclaimed lands except as follows, viz.: . . .

"(2) The owner shall not drill nor excavate for or otherwise seek or take oil, gas or other hydrocarbons upon said quitclaimed lands at any place thereon nearer than four hundred (400) feet to any well upon lands retained by the Oil Company, during the life of such well . . . "

The first cause of action further alleges that the defendant General Petroleum Corporation executed and caused to be recorded a quitclaim deed, quitclaiming the property described in the complaint, with one other parcel to the plaintiffs, and that the quitclaim deed contained the language above set forth as subdivision "(2)" of paragraph "XII" of the lease. The complaint further alleges that on the date of the recording of the quitclaim deed, the only well existing on lands retained by the defendants or any of them under said well within 400 feet of any part of lot 21 was the well known as "General Petroleum H-M No. 1" or "Hill-Midway No. 1," then producing from the Bell Sand. The complaint then recites that the development of the field, in which the premises are located, has resulted in the discovery of seven (7) separate and distinct zones, and the complaint describes these zones, their various thicknesses, and depth from the surface, and also sets forth a map showing these zones. The complaint further alleges that the defendants have drilled ten (10) wells within 400 feet of lot 21 described in the complaint, to the Bell, Meyer, Nordstrom and Buckbee zones, on lands in which plaintiffs have no right, title or interest, and the complaint sets forth the productivity of these various zones as measured in barrels of oil extracted to date from the wells within 400 feet of lot 21 drilled by defendants and on lands in which these plaintiffs have no right, title or interest. The complaint then alleges that the Hill-Midway No. 1 well ceased to produce oil in commercially paying quantities before September, 1928, and was finally abandoned on the twentieth day of February, 1929.

The complaint further alleges that the defendants are producing large quantities of oil within 400 feet from lot

21 and were producing this oil prior to the time the well known as Hill-Midway No. 1 ceased to produce oil in commercial quantities, and have been and now are producing large quantities of oil therefrom, and that this oil being so produced is being drained from beneath the premises known as lot 21; that the plaintiffs have no interest in the lands upon which the wells of the defendants are being operated, and the defendants do not intend to pay the plaintiffs any royalties for oil taken from beneath lot 21.

Plaintiffs then allege that the defendants will continue to produce oil from wells adjoining lot 21 and will continue pumping oil in large quantities from all productive zones thereunder, to plaintiffs' great and irreparable injury and damage.

Plaintiffs allege that by reason of the facts above set forth, the defendants have no further right, title or interest in and to lot 21 under subdivision "(2)" of paragraph "XII" of the said oil and gas lease, or otherwise.

Plaintiffs then allege that the terms of the quitclaim deed from defendants to plaintiffs constitutes a cloud upon the title of plaintiffs to the real property described in the complaint and that this cloud is preventing the plaintiffs from making an advantageous and highly profitable oil and gas lease thereunder, for the extraction of oil and gas therefrom; and that unless this cloud is removed the plaintiffs will be unable to enjoy the property and other rights owned by them in the same, and will be deprived of the full use thereof.

The complaint further alleges that the plaintiffs have had a *bona fide* offer from oil producing companies to lease the premises on a twenty per cent royalty basis, all of which will not affect or injure the defendants or any of them, in any way, in their operations on any of the premises described in the oil and gas lease attached to the complaint.

The second count contains most of the allegations of the first, and in addition alleges that there was no consideration for the covenant.

The third count is almost identical with the first, and contains the additional allegation that the consideration for the covenant wholly failed.

The property covered by the lease has been subdivided into blocks and lots and streets laid out. These lots are

grouped in the lease into four parcels, A, B, C and D. Parcel D or lot 21, described in the quitclaim deed mentioned in the complaint, is a lot with a 50-foot frontage and a depth of 150 feet. Within the 400-foot radius mentioned in subdivision (2) of paragraph XII of the lease, there were, at the time of the filing of the complaint, numerous producing oil-wells operated by defendant General Petroleum Corporation, and producing oil at a profit. Within this area the latter company, at the time the complaint was filed, also owned and operated profitably, oil-wells upon the lands of other parties, and in which plaintiffs had no interest.

On October 23, 1923, General Petroleum Company, one of the defendants herein, executed and recorded a quitclaim deed to plaintiffs, covering said lot 21. This deed recited that it was executed subject to paragraph XII, subdivision 2, of the lease. It is admitted that at the time said deed was executed the only well existing on lands retained by said defendants under said lease, and within 400 feet of said lot 21, was the well known as ''General Petroleum H-M No. 1''. It is also admitted that this well was at said time producing gas and oil in commercially paying quantities. No drilling operations have ever been conducted upon lot 21. Since the date of said deed, defendant Petroleum Corporation has drilled four wells within the said 400-foot radius, some of which were producing at the time of the trial, while others were being deepened to lower sand. The undisputed evidence shows that the oil from these fields exists in distinct zones, lying one under the other: These zones vary in thickness and in productivity, and are seven in number. They are designated by different names. The one nearest the surface is the Foix zone. Then, following in order as the drilling proceeds downward, are the Bell, Meyer, Nordstrom, Buckbee, O'Connell and Clark zones. The last-named zone is reached at a depth of some 8,500 feet. At the time the ''H-M No. 1'' well was drilled and when the deed was executed, only two of these zones were known to exist in this oil-field, to wit: The Foix and Bell. The others were discovered subsequently. Each of these seven zones is an entirely separate unit or pool of oil. Well ''H-M No. 1'' was, at the time the deed was executed, producing oil in paying quantities from the Bell zone, and

it has never been extended beyond that zone. The court found that this well was producing oil in paying quantities at the time of the trial, and this finding is supported by substantial evidence. The court found that, since the execution of the deed, defendants had drilled four wells within 400 feet of the surrendered lot, that they had drilled a total of nine wells on plaintiffs' property at a cost exceeding $1,600,000, and had paid in royalties up to June 1, 1929, in excess of $507,328.26. Of this amount plaintiffs received $375,587.99.

The position of appellants upon this appeal is indicated by the statement made in their opening brief in the following language:

"The theory upon which plaintiffs maintain this action is, First: That at the time of the recording and delivery of the quitclaim deed there was only one well on the demised premises within four hundred (400) feet of lot 21, and that this well at the time of the commencement of this action was not producing oil in paying quantities, and, Second: That even though there was on October 23, 1923, a producing well upon the demised premises within four hundred (400) feet of lot 21, which is still producing oil in paying quantities, nevertheless, upon the discovery of new and deeper zones beneath the demised premises, and beneath lot 21, plaintiffs have the right to drill to these new zones and produce oil therefrom unless the defendants are producing from these new zones on lands retained by them subject to the lease. Plaintiffs' theory being that the new zones are entirely separate and distinct from the so-called Bell zone from which the well retained by the lessee was producing oil on October 23, 1923, and that the purpose of the language in the quitclaim deed and in the lease was to prevent the plaintiffs from drilling on lot 21 in competition with the well retained by lessee on the demised premises, and was not designed to prevent plaintiffs from producing from independent zones. If plaintiffs drilled a well on lot 21 which did not compete with a well on lands retained by defendants, there could be no competition, and plaintiffs should be allowed to drill such a well and produce oil and gas therefrom."

As to the first contention, the trial court found that this well, known as "H-M No. 1", was producing oil in

paying quantities at the time of the commencement of the action. We have examined the record and find that witness McClaine, for defendant, testified that he was production manager for defendant General Petroleum Corporation. The following questions and answers appear in his testimony:

Q. "Now, in the month of September, October, November and December, 1928, and January and February, 1929, did Hill-Midway No. 1 produce oil in paying quantities? A. Yes. Q. Is Hill-Midway producing oil in paying quantities at this time? A. Yes."

During the course of the trial counsel for appellants summarized the situation as follows: "Now, this defendant retained a well at that time (when the quitclaim deed was executed) known as Hill-Midway No. 1 that was within 400 feet of lot 21. This is the only well that could affect our rights in lot 21. If that well is not producing oil in paying quantities that well cannot restrict us from developing lot 21. *If it is producing oil in paying quantities that theory of our case, of course, falls.* The finding upon this question of fact is a conclusive answer to the first contention of appellants, and, as counsel aptly remarked, 'the theory of course, falls'."

The second theory upon which appellants rely, in seeking nullification of the lease provision in question, is the failure of respondents to develop each of the oil zones underlying the 400-foot radius, and the refusal of respondents to permit them to develop a well upon lot 21, which was quitclaimed as we have stated. As the well "H-M No. 1", at the time the deed was executed, was extracting oil from the second or "Bell" zone, it is argued that inhibition to drill upon lot 21 does not apply to the other five oil zones beneath the "Bell" zone, and that appellants are therefore at liberty to sink a well upon this lot so long as they do not extract oil from a zone which is being developed by defendants. We cannot acquiesce in this construction of the lease. It does not say that plaintiffs shall not drill *to any sand* from which defendants are producing, but it says that they "shall not drill nor excavate for or otherwise seek to take oil, gas or other hydrocarbons upon said quitclaimed lands at any place thereon nearer than 400 feet to any well upon lands retained by the oil

company, during the life of such well''. No authorities are cited by appellants to uphold their contention. They simply complain and point out that defendants, under a literal interpretation of the lease, could sink and operate a number of other wells within the 400-foot radius and upon lands in which appellants have no interest, and thus drain the oil from underneath their lot 21, while appellants must stand by without any right to sink their own well upon that lot. This is a contingency which would reasonably have been foreseen and anticipated by appellants when they executed the lease. At that time two oil zones had already been discovered in the district, and it is reasonable to suppose that deeper drilling might penetrate additional zones. We are constrained to hold that as long as defendants are operating a well producing oil in paying quantities and within the 400-foot radius, appellants are bound by the prohibition, and this irrespective of the zone from which the oil is being abstracted by defendants.

In connection with the foregoing theory, appellants seek to invoke the rule that restrictive covenants will not be enforced where changed conditions in respect to the property render their enforcement inequitable, citing *Downs* v. *Kroeger*, 200 Cal. 743 [254 Pac. 1101], and similar cases. While the lease was fair and equitable when made, they state, subsequent events consisting of the discovery of new oil zones and the production of oil therefrom by defendants on lands in which plaintiffs have no interest, justify the court in releasing them from performance, due to the great hardship which would be imposed upon them. The distinction between the Downs case and the instant case is obvious. Here we have no changing conditions which have altered the situation. The physical conditions have never changed. The oil zones were always there. It is true some of them were not known, but as two of them had already been discovered, it is reasonable to presume that there might be others. There must be a change of conditions to justify the application of the rule. There is no change of conditions here. The contention is without merit.

Recovery upon the second and third counts is based upon the contention that there was no consideration for the covenant in the lease relating to restrictions, and that there

was also a failure of consideration for such covenants. The court found against appellants upon each theory, and we believe acted correctly in so doing. It appears from the lease itself that the consideration was the promise of defendants to drill wells and pay royalties and taxes. Therefore, when defendants made these promises, it was ample consideration for the agreement of plaintiffs to demise the premises, and to refrain from drilling any portion thereof which might be quitclaimed. (Civ. Code, sec. 1605.) Appellants urge that the restrictive covenant was supported by no consideration because it was inserted solely for the benefit of the lessee and was of no benefit at all to the lessor. They state that the lessee parted with nothing of value for it and the lessors received nothing of value therefor. Under this lease we do not believe it is permissible to segregate the various promises of defendants against the various promises of plaintiffs, and to say that certain promises were in consideration of certain other promises. The rule of law is that the whole of the promises of the lessee are consideration for the whole of the promises of the lessor. ''The single consideration of paying a specified sum of money by one party to a contract is sufficient to support several distinct stipulations by the other party to do, or refrain from doing, certain things, and it is unnecessary to repeat in every paragraph of the contract that such stipulations are entered into for the consideration once expressed.'' (6 R. C. L., p. 654, citing numerous authorities.) The law of implied covenants invoked by appellants has no application to this case, for here the measure of diligence required by the lessee is fully defined. (*Becker* v. *Submarine Oil Co.*, 55 Cal. App. 698, at p. 701 [204 Pac. 245].) It must be borne in mind that appellants are not, by this action, seeking to attack the entire lease, which is still in full force and effect between the parties. They are simply seeking to eliminate the restrictive covenants under which lot 21 was quitclaimed by defendants.

The fourth count is based upon the lack of mutuality, the authorities cited being section 3386 of the Civil Code, relating to specific performance of contracts and cases arising out of said actions. This action is not one involving specific performance, and such relief is not prayed for. The

rule laid down in the code was enacted solely with reference to the remedy available where specific performance of a contract is sought. The demurrer to this count was properly sustained.

The fifth count is for declaratory relief, and seeks a construction of the restrictive clause which we have discussed under the first count. Change of conditions under a restrictive clause is relied upon, and we have taken up and disposed of that theory. The demurrer to this count was also properly sustained.

The sixth count, involving the matter of damages, involves issues tried under the first count. If plaintiffs cannot avoid the restrictive clause and are bound thereby, they are not entitled to damages.

The seventh count seeks an injunction in connection with the restrictive covenant. The issues involved were tried also under the first count, under which we have held the restrictive clause to be valid and binding upon appellants.

In conclusion, we might observe that it is not the province of the court to alter a contract by construction or to make a new contract for the parties. Its duty is confined to the interpretation of the one which they have made for themselves, wholly without regard to its wisdom or folly. (13 C. J., p. 525.)

We therefore hold that the restrictive clause of the lease is not vulnerable to the attack made by appellants, and that it is a valid and subsisting obligation which must be respected by all parties.

The trial court having properly disposed of all the issues, both legal and of fact, and no error appearing in the record, it is hereby ordered that the judgment be affirmed.

Thompson (R. L.), J., and Pullen, P. J., concurred.