39 Cal.2d 93 (1952)
244 P.2d 895
WILVIAN JEWELL RENNER, Respondent,
v.
HUNTINGTON-HAWTHORNE OIL AND GAS COMPANY (a Corporation) et al., Appellants.
Docket No. L.A. 21759.
Supreme Court of California. In Bank.
June 4, 1952.
*95 Ben F. Griffith, Mize, Kroese, Larsh & Mize, and Newby, Holder & Newby for Appellants.
Blodget, Morris & Blodget, L.W. Blodget and June E. Blodget for Respondent.
SCHAUER, J.
Plaintiff, the owner of fee title to certain real property, obtained judgment quieting her title as against defendants, who claim under an oil and gas lease. This is *96 an appeal by the defendants. Plaintiff's position, which was accepted by the trial court, is that the term of the lease has expired. We have concluded that this position is correct, but that, because the lessee held over after the expiration of the lease and the lessor continued to accept royalty payments, there arose a tenancy from month to month which has not yet been terminated.
On April 23, 1921, plaintiff's predecessor in interest executed the oil and gas lease. The material provisions of the lease are as follows:
The habendum clause provides that the term of the lease is 20 years "and so long thereafter as oil or gas or other hydrocarbon substances can be secured therefrom in paying quantities within the definition hereinafter particularly specified, unless otherwise surrendered or forfeited by the Lessee."
The development provision requires the lessee to drill "with reasonable diligence until oil is found in paying quantities within the definition of such term next hereunder set forth, or to a depth at which further drilling would, to the judgment of the Lessee, be unprofitable, or terminate this lease ... [I]f oil should not be obtained in paying quantities ... in the first well drilled, the Lessee shall, as a condition of the continuation of any of the rights given to it by this lease, within sixty (60) days after drilling has ceased on said first well, commence upon the premises the drilling of a second well and shall prosecute the drilling of the same with reasonable diligence until oil is found in such paying quantities by the Lessee or until such well has been drilled to a depth at which further drilling would, in the judgment of the Lessee, be unprofitable."
The definition of "paying quantities" reads: "Oil in paying quantities shall be understood to mean a well drilled from which there may be pumped for a period of thirty (30) consecutive days a quantity of oil which shall average fifty (50) barrels of oil ... per day."
"The Lessee agrees to operate each completed well on the premises to its full capacity so long as such well shall produce oil in quantities deemed paying quantities within the definition aforesaid, while this lease is in force as to the portion of the premises on which such well is situated; provided, however, that nothing in this paragraph shall be construed as to require the Lessee to maintain such well to such capacity as would, within the judgment of experienced oil men, possibly result in the destruction of such well."
*97 In 1923 a well was brought in; initial production was 650 barrels of oil a day; by 1938 production had fallen to less than 50 barrels a day and since 1941 the well has produced 30 or 40 barrels a day. There is no other well on the premises.
In 1945 the lessor died and his interest in the land passed to plaintiff. Defendants are the successors in interest of the original lessee. Defendant Invader Oil Company has been in physical possession of the land and has operated the well since oil was discovered in 1923. The remaining defendants are owners of participating interests in production from the well.
Although production had fallen below the "paying quantities" rate of 50 barrels per day at the time when, on April 23, 1941, the 20 years specified in the habendum clause of the lease had passed, Invader continued to operate the well and the lessor (until his death in 1945) and plaintiff (until the institution of this action in 1947) continued to accept their royalty share without protest that the production was less than 50 barrels per day. The trial court found "that said well cannot be made to produce at the rate of 50 barrels of oil per day for 30 consecutive days, and it is not true that since April 23, 1941, oil or gas or other hydrocarbon substances may be pumped therefrom in paying quantities within the definition particularly specified in said lease." This finding is supported by the evidence.[1]
*98 According to the ordinary meaning of language the lease terminated on April 23, 1941, at the expiration of 20 years from the date of its making, because oil and gas could then no longer be produced therefrom in "paying quantities" as defined in the lease. Plaintiff contends and the trial court took the view that the lease means just what it plainly says. This construction of the lease is more tenable than the rather strained construction, hereinafter discussed, which is urged by defendants. [1] The oil lease, with its "and so long thereafter" phrase in the habendum clause, created a determinable fee interest in a profit a prendre. (Dabney v. Edwards (1935), 5 Cal.2d 1, 12 [53 P.2d 962, 103 A.L.R. 822]; Tanner v. Title Ins. & Trust Co. (1942), 20 Cal.2d 814, 819 [129 P.2d 383]; and cases cited therein and in 8 Cal.Jur. 10-Yr. Supp. (1948 Rev.), p. 624.) [2] A determinable fee terminates upon the happening of the event named in the terms of the instrument which created the estate; no notice is required for, and no forfeiture results from, such termination. (Henck v. Lake Hemet Water Co. (1937), 9 Cal.2d 136, 140 [69 P.2d 849]; Caswell v. Gardner (1936), 12 Cal. App.2d 597, 600 [55 P.2d 1222]; Macco Construction Co. v. Fickert (1946), 76 Cal. App.2d 295, 304 [172 P.2d 951].)
Defendants rely upon Transport Oil Co. v. Exeter Oil Co. (1948), 84 Cal. App.2d 616 [191 P.2d 129]. [3, 4] That opinion contains the following correct general statements (pp. 621, 622 of 84 Cal. App.2d): "In the evolution of oil and gas leases, the paying quantities phrase has come to have two entirely different meanings. In the habendum it serves to perpetuate the lease beyond the fixed term for as long thereafter as it would be mutually profitable to the parties. [Citations.] A different function is performed where the *99 term appears in the development provisions, for there it operates primarily for the benefit of the lessee, as a limitation upon his obligation to drill and pay royalties.... By the great weight of authority, the term, `paying quantities,' when used in the extension clause of an oil lease habendum means production in quantities sufficient to yield a return in excess of operating costs, even though drilling and equipment costs may never be repaid and the undertaking considered as a whole may ultimately result in a loss. [Citations.]" [5] Where the term appears in the development provisions of the lease, and the question is whether oil has been found in "paying quantities" so as to permit or require the drilling of other wells, the normal meaning of the term is such quantities as would lead to a reasonable expectation of a reasonable profit on the entire sum, including drilling costs, to be expended in prosecution of the enterprise. (See cases collected in 48 A.L.R. 887; 84 A.L.R. 761; 91 A.L.R. 900.)
These general statements apply where the term "paying quantities" is not expressly defined by provisions of the lease. However, the lease of which Transport was lessee, like the lease here, contained an express definition of the term "paying quantities." The material provisions of Transport's lease were as follows:
"The habendum clause provided: `The Lessee shall hold said land hereunder, for the period of twenty (20) years from, and after, the date hereof and as long thereafter as oil or gas is produced in paying quantities unless otherwise forfeited by Lessee in accordance with the terms of this lease.'" (Pp. 617-618 of 84 Cal. App.2d.)
"The duty to drill the first well was limited to a depth of 3,500 feet, `unless oil, in paying quantities shall have been obtained at a lessor [sic] depth.' Furthermore, a cash bonus was to become payable only `in the event oil is obtained in paying quantities in the well so drilled on the north half of said Lot Three.' And finally, the lessee's obligation to pay royalties was not to commence until `after the discovery and production of oil in paying quantities from said well.'" (P. 620 of 84 Cal. App.2d.)
The term "paying quantities" was defined as follows: "`For all purposes herein contemplated, a well shall be deemed to be producing oil in paying quantities when such well, operated in a diligent and skillful manner, will produce oil or gas or both of a value at the well of $15.00 per *100 day or more in excess of the reasonable cost of the fuel, labor, supplies and material required in the operation of such well.'" (P. 620 of 84 Cal. App.2d.)
In the Transport case the wells on the leased property were all producing but none was making as much as $15 per day. It was contended that the lease had expired and that production could be abandoned. The District Court of Appeal (p. 621 of 84 Cal. App.2d) held that "the effect to be given to the term `paying quantities,' in the habendum is not governed by the $15 per day definition, but is to be determined by reference to the established legal meaning of the term" (i.e., production yielding revenue in excess of operating costs); otherwise, said the District Court of Appeal, the operator of the wells could abandon production even though such production was mutually profitable to lessor and lessee, a result which "would do violence to the rule that such leases are to be construed in accordance with their reasonable and common sense meaning."
[6] Defendants urge that by similar reasoning the lease here should be rewritten to strike from the habendum clause the phrase "within the definition hereinafter particularly specified." As so rewritten the lease would continue for a term as long as operation of the well was "mutually profitable." Defendants would have us read into the habendum clause another provision of the lease which has nothing to do with the duration of its term; i.e., the provision that the lessee need not operate a well at a capacity which would result in its destruction. This construction, they say, is in accord with the construction which the parties themselves adopted when, after April 23, 1941, they continued to operate as if the lease were still in existence. These arguments ignore the elementary rule of construction, applicable to oil leases as well as to other documents, that the function of the court is not to make a new lease for the parties but to interpret the lease which they have made, "without regard to its wisdom or folly." (Hill v. General Petroleum Corp. (1932), 128 Cal. App. 284, 294 [16 P.2d 1035].)
[7] Defendants argue that because plaintiff and her predecessor in interest permitted Invader to continue production and accepted royalty payments, plaintiff "waived the right to cancel the lease" or "is estopped to deny that said lease is still in full force." These arguments are but another way of saying that, because plaintiff for a time accepted her royalty share of a production less than 50 barrels *101 a day, the lease endures so long as oil is produced at a rate which is "mutually profitable" rather than at the expressly defined rate of 50 barrels per day. In other jurisdictions it has been held that the lessor's acceptance of royalty does not "estop" or otherwise preclude him from insisting that the lease has expired. (Woodruff v. Brady (1937), 181 Okla. 105 [72 P.2d 709, 113 A.L.R. 391], and annotation in 113 A.L.R. 396; Gas Ridge v. Suburban Agricultural Properties (C.C.A. 5, 1945), 150 F.2d 363, 365; see Watson v. Rochmill (1941), 137 Tex. 565 [155 S.W.2d 783, 137 A.L.R. 1032], and annotation in 137 A.L.R. 1037.) We agree with this view rather than with the apparently contrary view expressed in Eagle Oil Co. v. Sinclair Prairie Oil Co. (D.C.N.D. Okla., 1938), 24 F. Supp. 612, 618, and McCoy v. Texon Royalty Co. (Tex.Civ.App., 1939), 124 S.W.2d 877, 881. Here, the Huntington defendants find waiver and the Invader defendants find estoppel from the fact that Invader expended time and money in continually producing oil. But there is no evidence that defendants changed their position to their detriment in reliance on plaintiff's continued acceptance of royalty payments. Of course Invader incurred operating expenses in order to continue production, but the continuing of production was an operation which was profitable to all parties after all operating expenses had been deducted from the proceeds of production.
[8] Defendants urge that their construction of the term "paying quantities" in the habendum clause of the lease is res judicata because of the decree of distribution in the estate of the original lessor, plaintiff's predecessor in interest. That decree distributed to plaintiff "All of the right, title and interest" of the lessor and stated, "The right of deceased at the time of his death, was, and the right of his estate now is, inter alia, 14 barrels out of each 100 barrels of oil produced and saved, together with four-fifths (4/5) of one (1) cent per 1,000 cubic feet of gas royalty, all as shown by the records in the office of the Recorder"; the decree contains no mention of any minimum rate of production. It is obvious that the decree did not purport to define the precise quantum of plaintiff's interest. [9] Even if it had purported to do so the probate court could not have adjudicated the respective interests of plaintiff and defendants in the oil land in question. (Noble v. Beach (1942), 21 Cal.2d 91, 98 [130 P.2d 426].)
*102 We must next decide what relationship existed between the parties after the lease terminated on April 23, 1941. After that date Invader made and the lessor and plaintiff as the lessor's successor in interest accepted monthly royalty payments. [10] If a lessee holds over after the expiration of his term and his lessor accepts monthly rental payments in the amount of the payments which the lessee had been making under the lease, the lessee becomes a tenant from month to month. (Civ. Code, § 1945; Agar v. Winslow (1899), 123 Cal. 587, 591 [56 P. 422, 69 Am.St.Rep. 84]; Colyear v. Tobriner (1936), 7 Cal.2d 735, 740 [62 P.2d 741, 109 A.L.R. 191]; Herman v. Rohan (1918), 37 Cal. App. 678, 681 [174 P. 349].)
[11] Notice to quit is necessary to terminate a month to month tenancy; such tenancy is "deemed to be renewed" each month "unless one of the parties gives written notice to the other of his intention to terminate the same, at least ... 30 days" before the expiration of the month; or either party to the month to month tenancy "may terminate the same by giving at least 30 days' written notice thereof at any time and the rent shall be due and payable to and including the date of termination." (Civ. Code, § 1946; see Sullivan v. Cary (1860), 17 Cal. 80, 85.) [12] The month to month tenancy here was never terminated by the required notice; therefore, the finding that "defendants have no right, title or interest whatever in said land," and the portions of the judgment which decree that plaintiff is entitled to exclusive possession and that defendants have no interest in or right to possession of the real property, are erroneous. (Cf. Moon v. Marker (1938), 26 Cal. App.2d 33, 37 [78 P.2d 460], where the lessees, prior to the end of the term of years fixed by their oil lease, completely ceased production and thereafter held over but, so far as appears, made no rental payments whatsoever; in that situation the lessees upon expiration of the fixed term of years became mere tenants at sufferance and no notice to surrender possession was required as a prerequisite to the maintenance of a possessory action by the lessors.)
[13] Defendants urge that the judgment must be reversed because the trial court failed to find on material issues. The Invader defendants complain of the omission of a finding as to whether forced increased production would probably destroy the well. Such a finding would have been irrelevant because of the theory accepted by the trial court; *103 if the lease had long since terminated (as the trial court correctly determined) and plaintiff was entitled to possession (as the trial court erroneously determined), the manner of future operation of the well, otherwise than by consent, express or implied, could have no effect on the rights of the parties.
[14] Defendants contend that the trial court should have made a finding as to whether gas was being produced in paying quantities. As previously stated, the court found that "it is not true that since April 23, 1941, oil or gas or other hydrocarbon substances may be pumped therefrom in paying quantities within the definition particularly specified in said lease." The lease contains no definition of the term "paying quantities" as applied to production of gas or other hydrocarbon substances. Plaintiff argues that the parties to the lease, by defining "Oil in paying quantities" and omitting any specific definition of what should constitute paying quantities of other substances, showed their intention that production of oil only should be the "measuring stick" in determining when the lease terminated. This construction, upon the record in this case, is tenable, and from the last quoted finding it appears that the trial court accepted it.
Finally, defendants contend that the trial court should have made a finding on the question of Invader's right to remove its casing, equipment and machinery from the premises. The trial court expressly declined to make any finding "concerning the title to or right to remove by any party any personal property placed upon the premises by Lessee or his successors in interest." [15] The lease provides that lessee shall have the right to remove casing, machinery, "and other property and improvements belonging to or furnished by said lessee." This provision of the lease, rather than the rules of law concerning removal of fixtures (see Civ. Code, §§ 660, 1013, 1019; 39 A.L.R. 1255), controls the right of the lessee to remove machinery and equipment. (R. Barcroft & Sons Co. v. Cullen (1933), 217 Cal. 708, 712 [20 P.2d 665]; Teater v. Good Hope Dev. Corp. (1939), 14 Cal.2d 196, 207 [93 P.2d 112].) [16] Defendants produced no evidence that the equipment and machinery on the premises belonged to or was furnished by the lessee or any of defendants; the record does not disclose who furnished such equipment and machinery; therefore, the trial court could not make a finding favorable to defendants concerning title and right to remove such property.
*104 Although the trial court correctly determined that the lease had terminated and did not, as defendants contend, err in omitting findings above discussed, it did err in determining that defendants have no right whatsoever in the real property and that plaintiff is entitled to immediate possession. Therefore, the judgment is reversed. Each party shall bear its own costs on appeal.
Gibson, C.J., Shenk, J., Edmonds, J., Carter, J., Traynor, J., and Spence, J., concurred.
Appellants' petition for a rehearing was denied June 26, 1952.
NOTES
[1] An expert witness testified as follows:

"A. The only thing, in my opinion, that could be done to increase the production on the well would be by lowering the tubing to a lower depth. You would probably, and would get an increase there of both your gross and net. Well, say you would lower the tubing 100 feet, I don't think you would get an amount there of, oh, say maybe ten, fifteen barrels out gross, but I don't think you would hold that for a long period of time. I would say that you would exhaust that down to a normal production within a two-weeks' period.
"Q. Do I understand by that latter statement that within a two-weeks' period it would be back to normal production? A. To the production that it is producing at the present time.
"Q. And what do you mean by ten or fifteen barrels gross? A. Well, that's your water and oil, you would get an increase of water, and if you get an increase in water, you would naturally get an increase in that oil.
"Q. Well, approximately, in your opinion, a well of that type, by lowering the pump, how much increase in oil production, average per day, would you get for thirty days? A. Well, assuming that the cut of the well, which I understand at the present time is about 30 per cent water, you wouldn't get an increase of net oil of only probably around three or four barrels per day. You might get five, I don't know.
"Q. Would there be any danger of sanding up the well or anything of that kind in connection with lowering the pump? A. Well, there would be if you lowered it too much, I would say yes, there would be danger of sanding it up.
"Q. Then what would happen in that event? A. Well, then, you simply have to pull the rods and tubing and clean the well out in order to get it back on production again."
Another expert, the actual operator of the well, testified that since 1938 (i.e., since production has been less than 50 barrels a day) to produce oil from the well at greater capacity than he had produced it would destroy the well within "sixty days probably, or maybe longer." Still another expert testified to the same effect. Obviously if the well is and has been since 1938 in a condition where forcing production to 50 barrels a day would destroy it within 60 days, it was not in 1941 in a condition where oil and gas could be pumped from it in "paying quantities" within the express definition of the lease.