[Civ. No. 35523. Second Dist., Div. One. June 30, 1970.]

BRUCE M. WEST et al., Plaintiffs and Appellants, v.
ROBERT W. RUSSELL, Defendant and Respondent.

## COUNSEL

Goodstein & Moffitt, John P. Moffitt and Stuart S. Barnett for Plaintiffs and Appellants.

Aidlin, Martin & Mamakos, and Arthur L. Martin for Defendant and Respondent.

## OPINION

**THOMPSON, J.**—Appellants, plaintiffs in an action to quiet title and to declare an oil and gas lease terminated because hydrocarbons are no longer being produced "in paying quantities," appeal from an adverse judgment. We affirm the trial court.

### Facts

In 1924 appellants' predecessors in interest entered into a community oil and gas lease with respondent's predecessor in interest. The lease provides in part: "Said lease shall continue for a period of five (5) years from and after the date of this Agreement, and so long thereafter as oil and/or gas may be produced on the demised premises in paying quantities." The leased premises consist of 11 lots comprising approximately one city block in Los Angeles. The property is bounded by 123d Street on the north, Ainsworth on the west, Menlo on the east, and 124th Street on the south. At the time the lease was made, the area was rural in character. It is now in the midst of a city.

The lease gives the lessee the right "to . . . drill for, produce, extract and take oil, gas, and other hydrocarbon substances, and water from, and store the same on said lands during the term hereinafter specified; with the right to enter upon said lands at all times during said term for said purposes and from time to time to construct, use, maintain, erect, repair, replace and to move thereon and remove therefrom all buildings belonging to the Lessee, together with tanks, machinery, telephones and telegraph wires and other structures, including all pipe lines which the Lessee may desire or need in carrying on its business and mining operations on said premises; with the right of way for passage over, upon and across the ingress and egress to and from said premises." Pursuant to the surface rights granted him by the lease, respondent has constructed improvements upon all but two of the eleven lots involved. An oil well is located on lot 10, buildings are located on lots 1, 2, 3, 4 and 8, and a sump occupies lots 11 and 12.

Respondent operates 15 wells in the area in addition to the one on the leased premises. The surface improvements are used by him in connection with the operation of the other wells, in addition to their use in connection with the well on the leased property.[1] Respondent has no other headquarters than that erected on the leased premises.

The only rent provided in the lease is a royalty of 20 percent of the production from the well. During the past few years, that production has been at the rate of 900 barrels per year. In the period from 1962 appellants, as lessors, have received in the aggregate approximately $40 per month, $480 per year, as royalties, their only compensation for the lease. They have paid as real property taxes on the property leased an average aggregate sum in excess of $3,200 per annum.

Respondent's average annual gross receipts from the lease for the fiscal years ending June 30, 1962, through June 30 1965, were $2,530.44. For the fiscal years June 30, 1962, through June 30, 1968, respondent's average gross receipts were $2,197.23. Respondent's average annual direct expense for the fiscal years ending June 30, 1962, through June 30, 1968, was $1,405.63. Respondent paid taxes and license fees for that period in the average annual amount of $133.34. Thus, disregarding items of overhead other than taxes and license fees, as for example, management expense and depreciation, respondent shows an average net profit from the lease in the amount of $981.51, if the period June 30, 1962, through June 30, 1965, is utilized. The corresponding average net profit figure computed on the same basis for the period June 30, 1962 through June 30, 1968, is $648.26.

On October 20, 1965, appellants filed their complaint to quiet title against the oil and gas lease. The complaint alleges that the lease term has ended because oil and gas are not being produced in paying quantities.[2] The trial court concluded "The lease and oil well thereon is producing in 'paying quantities' " and rendered judgment for respondent.

### Issues on Appeal

Appellants in their brief on appeal contend: (1) the conclusion of the trial court that the well is producing "in paying quantities" is not supported by the evidence; and (2) the trial court erred in sustaining an objection to evidence offered by appellants.

---

[1]No issue of the extent of surface rights granted is involved in this appeal.

[2]The complaint also alleges breaches of the lease which are not material to this appeal.

## Sufficiency of Evidence

██ Our examination of the record in the case at bench reveals substantial evidence to support the conclusion reached by the trial court. ██ "Production in paying quantities" as that term is used in the habendum clause of an oil and gas lease is defined by the vast weight of authority as "production in such quantity as will pay a profit to the lessee over and above the cost of operating the well . . . and marketing the product, although the cost of drilling and equipping the well . . . may never be repaid and the operation of the [well] may eventually, considering the cost of drilling and equipment, result in a loss to the lessee." (2 Summers, Oil and Gas (perm. ed.) § 306, pp. 337-338; Brown, The Law of Oil and Gas Leases, § 5.03 and cases there cited; Maxwell, *Oil and Gas Lessee's Rights on Failure to Obtain Production During the Primary Term or to Maintain Production Thereafter*, 3 Rocky Mt. Mineral L. Institute 133, 167; see *Transport Oil Co.* v. *Exeter Oil Co.*, 84 Cal.App.2d 616, 622 [191 P.2d 129]; *Barnard* v. *Gibson*, 100 Cal.App.2d 527, 534 [224 P.2d 90]; *Renner* v. *Huntington-Hawthorne Oil & Gas Co.*, 39 Cal.2d 93, 99 [244 P.2d 895].)[3] The rationale of the rule of construction is that the lessee having undertaken the risk of drilling is entitled to the benefit of his bargain so long as production is financially advantageous to him. (2 Summers, Oil and Gas (perm. ed.) § 307, p. 343.)

██ Here, there is evidence from which the trial court properly could have found that at all times material production from the well in question was in such quantity as to pay a profit to the lessee over and above the cost of operating the well. Whether we compute average income and expense for the period of the fiscal years ending June 30, 1962 through June 30, 1968, as contended by appellants, or for the fiscal periods June 30, 1962 through June 30, 1965, as contended by respondent, the lessee's average annual income exceeds his average annual expenses as those are established in the record. Applying appellants' theory, the average annual excess is $648.26; applying respondent's theory, it is $981.45.[4]

Appellants argue, however, that: (1) California does not follow the general rule of construction of the phrase "production in paying quantities"; and (2) evidence of expenses excluded by the trial court in its determina-

---

[3] Since no extrinsic evidence in aid of interpretation of the lease was offered in the trial court, we are required to construe the instrument and may not rely solely on the construction adopted by the trial judge.

[4] In many jurisdictions, a good faith determination by the lessee that a well is producing in paying quantities suffices to satisfy the language of the lease clause here in issue. (2 Summers, Oil and Gas) (perm. ed. § 307, p. 343.) Since respondent has not asserted that this proposition is applicable in California, we have not considered the point.

tion that the lessee operated at a profit if properly considered results in the conclusion that the operation was at a loss. ·

Appellants contend that the phrase "production in paying quantities" must be construed in California to mean production which is mutually profitable to the lessor and lessee. They argue that the test is not met here because the evidence establishes conclusively that the lease is not profitable to the lessors. In asserting their contention of the construction to be given the critical term of the lease, appellants rely upon language in *Transport Oil Co.* v. *Exeter Oil Co., supra,* 84 Cal.App.2d 616; *Renner* v. *Huntington-Hawthorne Oil & Gas Co., supra,* 39 Cal.2d 93; *Montana-Fresno Oil Co.* v. *Powell,* 219 Cal.App.2d 653 [33 Cal.Rptr. 401]; and *Barnard* v. *Gibson, supra,* 100 Cal.App.2d 527. The language has its genesis in *Transport Oil* and is perpetuated in the later cases relied upon by appellants. In *Transport Oil,* the court, in distinguishing between the meaning to be given the phrase "production in paying quantities" used in the context of the lessee's obligation to conduct further drilling and the meaning of the identical phrase when used in the habendum clause extending the initial term of an oil and gas lease, said (84 Cal.App.2d 616, 621): "In the evolution of oil and gas leases, the paying quantities phrase has come to have two entirely different meanings. In the habendum it serves to perpetuate the lease beyond the fixed term for as long thereafter as it would be mutually profitable to the parties. [Citations.] A different function is performed where the term appears in the development provisions, for there it operates primarily for the benefit of the lessee, as a limitation upon his obligation to drill and pay royalties." The court then stated: "By the great weight of authority, the term, 'paying quantities,' when used in the extension clause of an oil lease habendum means production in quantities sufficient to yield a return in excess of operating costs, even though drilling and equipment costs may never be repaid and the undertaking considered as a whole may ultimately result in a loss." (84 Cal.App.2d 616, 622.)

The "mutually profitable" phrase used by the court in *Transport Oil* considered in context and in relation to the other language of that case is not a limitation upon the specific definition of "paying quantities" adopted by the court. The phrase is used rather to distinguish the situation in which the "paying quantity" phrase relieves a lessee from an obligation to drill where he will not recover his drilling costs and the only benefit will inure to the royalty recipient from the situation where the same phrase results in a continuation of the lease and the continued opportunity of the lessee to profit from his investment. In the latter instance, the benefit is "mutual" so long as the lessor receives royalties and the lessee operates at a profit. The later cases adopting the *Transport Oil* language, which are relied upon

by appellants, use it in the same context and with the same apparent meaning. We thus conclude that appellants' contention of the construction to be given the phrase "production in paying quantities" must be rejected.

Appellants contend, also, that the trial court erred in not considering items claimed by them to be expenses incurred by respondent in the operation of the well. Those items include an average annual rental cost of a rig for "pulling the well" and various overhead charges. The record does not support appellants' contention. While appellants contend that there should be charged as a direct cost of operating the well the fair rental value of a rig needed to periodically "pull" and service it, the evidence discloses that respondent uses a rig owned by him for that purpose. Possibly depreciation and other items of cost incident to the owned rig could properly be charged as overhead expenses in determining net profit from the well if those costs were established by the evidence. Appellants, however, introduced no evidence bearing on the amount of these or any other items of overhead. They thus failed in their burden of proof and their contention must be rejected.

### Exclusion of Evidence

Appellants offered testimony that by reason of the oil and gas lease on the property lending institutions would not make loans for the development of the land. Respondent's objection on the ground of irrelevancy was sustained. On brief, appellants contend that the evidence is relevant to show that enforcement of an equitable servitude on the land in the form of the oil and gas lease is inequitable by reason of changed conditions. The theory upon which appellants now contend the evidence should have been admitted is not, however, raised in their complaint, nor is it encompassed in the pretrial order. The trial court, thus, properly ruled that the evidence was irrelevant to the issues before it.

### Conclusion

The judgment is affirmed.

Wood, P. J., and Gustafson, J., concurred.