[No. B032466. Second Dist., Div. Seven. Feb. 16, 1990.]

VINETTA E. LOUGH, Plaintiff and Respondent, v.
COAL OIL, INC., Defendant and Appellant.

**COUNSEL**

James T. Duff for Defendant and Appellant.

Lynch & Buchanan, Robert H. Buchanan, Andrews & Kurth, Gregory C. Brown, Sylvia M. Goodrich and Pamela J. Anderson for Plaintiff and Respondent.

## OPINION

**WOODS (Fred), J.**—This is an appeal by defendant and appellant Coal Oil, Inc., a California Corporation, hereafter referred to as "Coal Oil" from an order of the Los Angeles County Superior Court, granting a motion for summary adjudication of issues, on May 20, 1987, in favor of plaintiff and respondent Vinetta E. Lough, hereafter referred to as "Lough" and a judgment entered on November 23, 1987, in favor of Lough. Affirmed.

## I.

### INTRODUCTION

Lough purchased the property which is the subject of this lawsuit at a tax sale from the State of California in 1981. The original deed from the State of California indicates that the property acquired by Lough was "ex of mining rights." The judgment of the superior court has, inter alia, resulted in an interpretation of the words "ex of mining rights" as referring specifically to the existing oil and gas lease of Coal Oil and not a general divesture of Lough's rights to extract or lease for purposes of extraction, oil, gas and other subsurface substances. The superior court judgment further provides that the lease of Coal Oil has terminated by its own terms for failure of the property to yield production in paying quantities and that Lough was entitled to a $21,466.62 unpaid royalty on oil and gas extracted from the property from January 28, 1981, to March 31, 1987. Coal Oil has appealed maintaining that it has an existing leasehold interest in the property entitling it to continue extracting oil and gas since the property did render production in paying quantities, that royalties were not due to Lough, and that Lough acquired only the surface rights in the property by virtue of its deed from the State of California and not any subsurface rights.

## II.

### FACTUAL AND PROCEDURAL SYNOPSIS

The real property which is the subject of this action consists of two lots in the City of Long Beach, California. In 1951, the owner of the property

entered into an oil and gas lease which granted to the lessee the right to extract oil and gas from the property. The lease specifies in its habendum clause that it was to last for 20 years and "so long thereafter as . . . [hydrocarbons were] produced therefrom." There is no evidence in the record that the subsurface estate was ever permanently severed from the surface estate or that there was ever any subsurface interest conveyed other than in the form of a leasehold estate, with the oil and gas leasehold interest of Coal Oil being the only existing leasehold estate in existence at the time of this litigation.

In 1951, Cotten No. 1 well was drilled on the property by the then lessee. The County of Los Angeles assessed the rights of the lessee under the lease separately from the rest of the property, labeling the lessee's interest, "mining rights," and the lessor's interest as the remainder of the property. Although by grant deed dated October 22, 1965, Coal Oil acquired both the lessor's and lessee's interests in the property, the county continued to assess the surface and subsurface interests separately.

Coal Oil stopped paying taxes on anything but the leasehold estate in subsurface rights in 1975. The State of California commenced foreclosure proceedings on the lessor's interest in the property for nonpayment of taxes in June 1975, resulting in a tax sale of that interest to Lough on January 28, 1981. Lough received a tax deed from the state containing the following property description: "Manila Avenue Tract Lots 39 and Ex of Mining Rights Lot 40 Blk 35." During the period from June 1975 to June 1980, Coal Oil was assessed taxes only on its "mining rights" or leasehold estate in the lease.

Because Coal Oil contended that the property still belonged to it, Lough requested from the State, and received, an amended tax deed, in which the phrase "ex of mining rights" was deleted from the property description.

Between January 28, 1981, and March 1987 (the last month for which records were available before trial), Coal Oil entered the property and removed some oil and gas and other hydrocarbons. Coal Oil failed to pay to Lough the lessor's royalty due under the lease. Substantial evidence at trial established the value of the hydrocarbons removed by Coal Oil for the 18-month period from July 1981 through December 1982 was $51,766.14 while expenses during that period were $67,612.76. Income was $55,467.06 for the 51-month period from January 1983 through March 1987 while expenses were $63,447.68. The evidence further established that the value of Lough's one-fifth royalty on production from the lease was $21,446.62, plus prejudgment interest in the amount of $5,947.20.

Coal Oil disputed the classification of some costs as operating costs during the first 18-month period. Coal Oil does not, however, dispute any of the costs as operating costs incurred during the second 51-month period or the fact that those costs exceeded the value of production during that period. No evidence was adduced that the well is capable of being made productive again.

Lough filed a complaint on June 8, 1982, seeking to have title to the property quieted in Lough, damages for Coal Oil's trespasses on the property, and a declaration that Lough was the legal and equitable owner of the property. Coal Oil alleged in its answer that it was the owner of both the "surface" and "subsurface" interests in the property and that it had an absolute right to enter upon the property to remove oil and gas therefrom.

In February 1987, Lough moved for summary adjudication of certain issues. By order dated May 20, 1987, the trial court ruled in Lough's favor on each of the issues, finding that:

1. Lough is the owner in fee simple of the property, subject to the rights, if any, of Coal Oil under the lease; and

2. If the lease still existed after January 28, 1981, Lough is entitled to a one-fifth royalty on all hydrocarbons produced from the lease after that date.

Following a court trial on the issue of whether the lease was still in existence, the trial court found that: 1. The language of the lease implies that the lease will terminate after the initial 20-year term unless production is in "paying quantities";

2. Whether there were "paying quantities" of production was to be determined from the standpoint of the lessee (Coal Oil);

3. In determining whether production was in "paying quantities," certain expenses claimed by Coal Oil to be "extraordinary" or "expenses of drilling" were in fact costs of operation to be subtracted from production; and

4. Production had not been in paying quantities during the 18-month period from July 1981 to December 1982, nor during the 51-month period from January 1983 through March 1987.

The final judgment, entered November 23, 1987, awarded Lough $21,446.62 as her one-fifth royalty on the oil and gas produced from the property from January 28, 1981, to March 31, 1987, plus costs and prejudgment interest in the amount of $5,947.20. The judgment states that the lease

terminated as of December 31, 1982, that Coal Oil has no further interest in the property, and orders Coal Oil to remove its equipment, fill all excavations and properly abandon the well in accordance with state law. From this judgment and the order of the lower court dated May 20, 1987, Coal Oil filed a timely appeal.

## III.

### CONTENTIONS

The following contentions are raised by Coal Oil on this appeal:

a. The trial court erred when it determined that the tax deed conveyance included subsurface "mining rights" because these rights were separately assessed to Coal Oil, were always retained by Coal Oil, who paid the taxes thereon and were, as a matter of law, not conveyed to Lough under a tax deed conveying the subject property "ex of mining rights."

b. The trial court erred in concluding that revenues from oil and gas sales did not exceed operating costs.

c. The trial court erred in finding that extraordinary costs to increase oil production were normal operating costs. The extraordinary costs should not have been considered in determining whether the well produced oil and gas in "paying quantities."

d. The trial court erred in not considering a total period of six years in determining productivity of the well, since a leasehold need not be continuously productive in order to maintain the lessee's rights, and "paying quantities" must be measured over a reasonably lengthy period of time.

## IV.

### DISCUSSION

A. *Standard of Review.*

The trial court granted summary adjudication of certain issues in favor of Lough. The court ruled that Lough was the owner of the property, subject to the rights, if any, of Coal Oil under the lease and that if the lease was in existence after January 28, 1981, Lough was entitled to the landowner's royalty under the lease for any hydrocarbons removed from the property after that date. The court can grant summary adjudication of issues as to which there exist no material triable controversy. (Code Civ. Proc., § 437c,

subd, (f).) ■ To the extent this court reviews the judgment granting summary adjudication as a matter of law, the review will be de novo. (Cf. *Goddard* v. *South Bay Union High School Dist.* (1978) 79 Cal.App.3d 98, 105 [144 Cal.Rptr. 701].)

The remaining issues were tried to the court through stipulation and live testimony. The trial court found that the lease had expired and that Lough was entitled to a specific dollar amount of royalties for hydrocarbons taken by Coal Oil from the property after Lough acquired her interest in the property. The review on appeal presents a mixed question of law and fact. ■ To the extent that this court reviews the trial court's construction of the lease as a matter of law, an oil and gas lease is to be construed liberally in favor of the lessor (Lough) and strictly against the lessee (Coal Oil). (See, *Stanolind Oil & Gas Co.* v. *Guertzgen* (9th Cir. 1938) 100 F.2d 299, 300-301; *Bailey* v. *Williams* (Tex.Civ.App. 1920) 223 S.W. 311, 313; 2 Summers, Oil and Gas (permanent ed. 1959) § 372, pp. 485-502.)

■ To the extent this court reviews a decision of the trial court as to a disputed question of fact, the decision must be sustained on appeal if there is any substantive evidence to support the decision. (*Ellison* v. *Ventura Port District* (1978) 80 Cal.App.3d 574, 581 [145 Cal.Rptr. 665].)

B. *The Trial Court Properly Concluded That Lough Acquired Fee Simple Title to the Property, Subject Only to the Rights, If Any, of Coal Oil Under the Oil and Gas Lease.*

The trial court granted summary adjudication concerning the first major issue on appeal, namely, what rights were conveyed to Lough by the tax deed. ■ The trial court correctly found that the phrase "ex of mining rights," under the facts in this case, meant that Lough obtained fee title to the property, subject to Coal Oil's rights to extract minerals pursuant to the existing lease. Coal Oil's basic contention is that the original tax deed to Lough, which carried the phrase "ex of mining rights," means that Coal Oil obtained a perpetual, undefined mineral interest in the property and that Lough obtained no "subsurface" rights whatsoever.

Oil and gas interests are by nature unique, and the attempt to classify such interests in legal terms presents " 'as thorny a problem as has challenged the ingenuity and wisdom of legislatures [and courts].' " (*Lynch* v. *State Bd. of Equalization* (1985) 164 Cal.App.3d 94, 99 [210 Cal.Rptr. 335].) ■ The ownership or title to oil and gas is a limited estate in land in the nature of a *profit à prendre* (*Lever* v. *Smith* (1939) 30 Cal.App.2d 667, 670-671 [87 P.2d 66]) or the right to take something from the land, which is a property interest in the nature of an incorporeal hereditament.

(*Callahan* v. *Martin* (1935) 3 Cal.2d 110, 122 [43 P.2d 788, 101 A.L.R. 871].) There is no actual ownership of the oil or gas in place; possession is established when the oil or gas is recovered at the surface and the owner has at that time the right to keep the oil and gas as his property. (*Lynch* v. *State Bd. of Equalization, supra,* 164 Cal.App.3d at p. 102.)

In the instance where one entity has fee simple ownership of the property to all depths, that owner has the exclusive right to drill for and produce oil and gas on that property. (*Dabney-Johnston Oil Corp.* v. *Walden* (1935) 4 Cal.2d 637, 649 [52 P.2d 237].) The exclusive right to drill for and produce oil and gas can be granted to another by use of an oil and gas lease which assigns the right to explore for and produce oil and gas to the lessee under the lease, subject to certain terms and conditions generally, including a royalty payable to the fee owner of the property. (*Ibid.*)

It is undisputed that in the present case, an oil and gas lease was granted to a predecessor in interest to Coal Oil, with which Coal Oil became vested. There was never any other severance of the minerals in the property of any type. ▪ There is a significant difference between a permanent right to extract oil and gas and the interest of a lessee under an oil and gas lease. An oil and gas lease is a privilege to take oil and gas for a *limited duration* and includes other duties, such as the duty to commence and complete the well with diligence and within a reasonable time. (2 Summers, Oil and Gas (permanent ed. 1959) § 392, pp. 511-512.)

▪ In California, an oil and gas lease with a "so long thereafter" habendum clause creates a determinable fee interest in the nature of *profit à prendre,* an interest that terminates upon the happening of the specified event with no notice required. (*Renner* v. *Huntington etc. Oil & Gas Co.* (1952) 39 Cal.2d 93, 98 [244 P.2d 895].) ▪ Coal Oil seeks to have its lessee's interest in the oil and gas lease converted by the tax deed into some greater estate, apparently some sort of perpetual *profit à prendre.* However, in this case, there was never a conveyance of any perpetual right to drill for the oil and gas underlying the property. Instead, there was only a *lease* of the right to drill for oil and gas for a period of 20 years, and so long thereafter as production from the lease was obtained.

Coal Oil attempts to convert its "mining rights" into something more permanent than the interest of an oil and gas lessee by vague references to differences between "surface rights" and "subsurface rights." Coal Oil's citations to 3 American Law of Mining (2d ed. 1989) section 86.03, *Gerhard* v. *Stephens* (1968) 68 Cal.2d 864, 877-879 [69 Cal.Rptr. 612, 442 P.2d 692], and *Webermeier* v. *Pace* (1977) 193 Colo. 157 [563 P.2d 950] are all references to authorities discussing the situation where a permanent interest, or

perpetual *profit à prendre,* in the oil and gas had been conveyed. In this case, there was no such conveyance. Just as the state could not foreclose on any greater interest than that upon which taxes had not been paid, neither could the state enlarge the lessee's interest in the lease into a perpetual *profit à prendre.* Consequently, the lower court correctly determined that once the lessor's interest in the property was sold to Lough by the state, Coal Oil was left with only its interest as lessee under the lease, an interest which could last only as long as the lease itself.

Contrary to the contentions of Coal Oil in its brief on appeal, there is no California case to date which addresses the meaning of "ex of mining" rights in this context. One of the cases relied on by Coal Oil, *Alspach* v. *Landrum* (1947) 82 Cal.App.2d 901 [187 P.2d 130], is a case where the plaintiff failed in his attempt to establish a prima facie case by admissible evidence of entitlement to vested ownership of the property in dispute. Having failed to carry his burden of proof in the trial court, plaintiff then contended that the words (ex of Mining Rights) inserted in a deed created an ambiguity in the legal description. (*Id.* at p. 904.) It is true that the court found no ambiguity, latent or patent, and held that the deed had conveyed "the state's interest in and to the described property with the exception of the mineral rights." (*Ibid.*) The holding in *Alspach* is undoubtedly correct under the facts of that case; however, the holding is a far cry from a bright line holding that such a phase, devoid of any consideration of the facts surrounding a particular conveyance, will always divest a surface owner of any subsurface rights.

The other case relied on by Coal Oil, *Arnett* v. *Sinclair Prairie Oil Co.* (W.D.Ky. 1948) 88 F.Supp. 343, is not supportive of Coal Oil's position on appeal in that the case is readily distinguishable. In *Arnett,* predecessors in interest had clearly severed the surface rights from subsurface rights by way of mesne conveyances and reservations. (*Id.* at p. 345.) In this instance, no such severance occurred and only the interest of an oil and gas lessee of limited duration is involved.

We thus conclude that the deed conveyed to Lough all interest in the property, subject to Coal Oil's right to extract oil and gas pursuant to the terms of the lease.

C. *The Trial Court Properly Concluded That the Oil and Gas Lease Had Terminated by Its Own Terms After Years of Failure to Produce Oil or Gas.*

The second major issue on appeal is whether the lease terminated and, if so, when. As discussed above, the trial court properly concluded that the fee

interest acquired by Lough at the tax sale remained subject to the mineral lease of Coal Oil. In a trial to the court, substantial evidence supported the court's determination that the lease had ended by its own terms because the lease had not produced oil or gas in paying quantities over a more than six-year period.

 1. *The undisputed stipulated facts admit that for a period of more than four years preceding the trial, the Cotten Well failed to produce oil or gas in paying quantities.*

 It is common to observe in some oil and gas leases, including the lease in issue here, failure to state a fixed term. Rather, termination is established by the use of a "habendum" clause. Pursuant to such a clause, the lease remains in effect until such time as oil and gas is no longer produced in "paying quantities." "Paying quantities" is defined to be quantities of oil or gas, the proceeds of which are sufficient to exceed ongoing operating costs.[1] The initial drilling and equipping costs (i.e., "sunk" costs) are excluded from this calculation. There is no hard-and-fast rule for determining over what period the paying quantities analysis must be made. Obviously, the period cannot be unreasonably short (i.e., a few days or even weeks) or else a lessor could claim that a lease had terminated when in fact it was merely shut-in for repairs or maintenance. On the other hand, using an excessively long period of many years could keep a lease "alive" long after it had become uneconomic and was no longer producing in "paying quantities" by using high initial and very short-lived production rates to claim an artificial "profit" years later through averaging.

Existing decisions reveal that the parameters utilized by the courts in determining whether or not a lease is producing in paying quantities ranges

---

[1] Coal Oil cites *Barnard* v. *Gibson* (1950) 100 Cal.App.2d 527, 534 [224 P.2d 90], for the incorrect proposition that where the phrase "paying quantities" is implied in a lease, some lesser amount of production is required to keep the lease alive than where the phrase is expressly set forth in a lease. In *Barnard,* the lessee claimed that the lease had not terminated because a small amount of production (3.15 barrels per day) was being obtained from the lease, although the operating expenses exceeded the value of this production. (*Id.* at p. 533.) In holding that the lease had terminated for lack of production in paying quantities, the court made no distinction between express and implied "paying quantities" provisions, but rather treated them equally. (*Id.* at pp. 533-534.) The complete quote is as follows: "It is said in 58 Corpus Juris Secundum, at page 469: 'Under a lease for a specified period and as long thereafter as oil or gas is "produced" from the land, it has generally been held that *the word "produced" means the same, or substantially the same as "produced in paying quantities."* Thus it is not sufficient, in order to continue the lease beyond the primary period, to have any production, however small. *The production must be tangible and substantial and in such quantities as to yield a profit*; the oil or gas must be produced in such quantities as to be susceptible of division and to pay the landowners a royalty, even though small.' " (Italics added.) (*Ibid.*) The lower court correctly read the Cotten lease to require production from the lease in an amount sufficient to yield at least some minimal profit to Coal Oil.

from six to twenty-five months. While a month was "inadequate to provide a reasonably accurate financial picture as to the profitability of production," an entire year was an adequately lengthy period. (*Transport Oil Co.* v. *Exeter Oil Co.* (1948) 84 Cal.App.2d 616, 624 [191 P.2d 129]. In *Barnard* v. *Gibson, supra*, 100 Cal.App.2d at page 533, the court considered the productivity of a well over a period of 527 days (or almost a year and a half), the entire time the well was producing. In *Montana-Fresno Oil Co.* v. *Powell* (1963) 219 Cal.App.2d 653 [33 Cal.Rptr. 401], the court noted that production had ceased during both a six-month and nineteen-month period, and concluded that the lease had terminated. In *Clifton* v. *Koontz* (1959) 160 Tex. 82 [325 S.W.2d 684], the court looked to periods of 12 months, 13 months and 6 months. In *Vance* v. *Hurley* (1949) 215 La. 805 [41 So.2d 724], the court considered the entire 25-month period of production. In *Garcia* v. *King* (1942) 139 Tex. 578 [164 S.W.2d 509], the court considered an eight-month period. But the final decision of an appropriate period is left to the sound discretion of the trial court taking into account all of the existing facts.

■ In the present case, substantial evidence demonstrates that the Coal Oil lease terminated by its own terms. Here, the trial court looked to the financial condition of the lease over the final fifty-one-month period prior to trial, not six months, one year or even two years. The evidence for this more than four-year period from January 1983 to March 1987[2] supports the following income and expense figures:

| | |
|---|---|
| Expenses (costs of $52,354.27 plus landowners' royalty of $11,093.41) | $63,447.68 |
| Gross Income | 55,467.06 |
| *Loss* to Coal Oil | $ 7,980.62 |

The record does not reveal that Coal Oil disputed any of this evidence. Coal Oil's arguments disputing certain "extraordinary" costs does not pertain to this 51-month period. The costs disputed by Coal Oil relate *solely* to the earlier period of July through November 1982.

Clearly, substantial evidence supports the trial court's decision that during this more than four-year period a lack of production in paying quantities was extant.

---

[2] March 1987 is the last month for which production figures were available as of the June 1987 trial date.

*2. The trial court properly held that the Coal Oil lease terminated during another, earlier 18-month period due to lack of production in paying quantities.*

The trial court found that the Coal Oil lease had been noneconomic (and thus terminated) for the 18-month period from July 1981 to December 31, 1982. As indicated above, an 18-month period to review the economics of a lease is more generous to the lessee than the periods used by many courts in prior case law. Such an 18-month period was both legally correct and well within the trial court's discretion. The income and expenses for the period (Jan. 1981 to Dec. 31, 1982) reveals:

Expenses

| | |
|---|---|
| Costs | $57,259.53 |
| Landowners' Royalty | 10,353.23 |
| Total Expenses | $67,612.76 |
| Gross Revenue | 51,766.14 |
| *Loss* to Coal Oil | $15,846.62 |

Given these numbers, which clearly establish lack of production in paying quantities, Coal Oil attempts to keep the lease alive by disputing the characterization of certain of the expenses. Coal Oil thus argues that $41,024.89 of the expenses from exhibits 101, 102, 104 and 105 are "extraordinary" and should not be included as operating expenses in the "paying quantities" analysis.

The disputed invoices are dated between July 1982 and July 1983. The testimony of Coal Oil's witness, Renick Sampson, was that each of these expenses was incurred as part of an overall operation to stimulate production from the well by reperforating the casing at locations different from the original perforations. However, it is apparent that exhibit 102 is not related to the reperforation operation, since the invoices contained in that exhibit are dated months after the reperforation operations and describe the work performed as *repairs* to the "jack shaft." By law, repairs are a type of ordinary operating expense. (*West* v. *Russell* (1970) 12 Cal.App.3d 638, 642 [90 Cal.Rptr. 772, 43 A.L.R.3d 1].) Similarly, exhibit 104 represents the cost of equipment used to clean the well casing, another type of ordinary operating expense. (*Barnard* v. *Gibson, supra*, 100 Cal.App.2d at pp. 534-535.) Consequently, the expenses represented by exhibits 102 and 104 are clearly ordinary operating expenses.

The only issue remaining is the question of whether the remaining costs of reperforating and testing the well are properly considered operating

costs. Reperforating and testing of an oil and gas well consists of lowering a tool into the well which shoots projectiles through the metal walls (or pipe) of the well in order to allow additional avenues for oil and/or gas to enter into the well. If the existing perforations in the well become plugged up, this reperforation is a necessary repair or maintenance operation. It does not involve any new drilling in the well and does not require the installation of any new equipment. The cases cited by Coal Oil in support of its argument that these costs should be capitalized rather than expensed all relate to costs of installing *new equipment* on an existing well. These cases are clearly inapplicable because the costs represented by exhibits 101 and 105 are *not* costs of purchasing new equipment, but rather are costs of modifying the existing well bore in an attempt to produce more oil. The only thing new or different about the well after these operations were completed was that the well had more holes in its casing.

Operations which merely serve to improve the productivity of a well and which do not involve new drilling or major equipment, are in the nature of repairs or maintenance and have long been held to be items which are considered current expenses in determining whether or not a well is producing in paying quantities. Current operating expenses have been held to include:

1. *Cleaning out and servicing of wells* (*West* v. *Russell, supra,* 12 Cal.App.3d at p. 644; *Barnard* v. *Gibson, supra,* 100 Cal.App.2d at pp. 534-535);

2. Labor costs, including the costs of hiring a pumper (*Kerr* v. *Hillenberg* (Okla. 1962) 373 P.2d 66; *Sunburst Oil & Refining Co.* v. *Callender* (1929) 84 Mont. 178 [274 P. 834]);

3. Taxes, including taxes on "mining rights" (*West* v. *Russell, supra,* 12 Cal.App.3d 638);

4. Electricity (*Edwards* v. *Hardwick* (Okla. 1960) 350 P.2d 495; *Fick* v. *Wilson* (Tex.Civ.App. 1961) 349 S.W.2d 622); and

5. Lessor's royalties (*Welport Oil Co.* v. *Fairfield* (1942) 51 Cal.App.2d 533, 541 [125 P.2d 97]; *Transport Oil Co.* v. *Exeter Oil Co., supra,* 84 Cal.App.2d 616, 622-623).

In summary, because the costs incurred in the Cotten Well do not represent costs of reequipping the well, but instead represent maintenance or repair of the well itself, these expenses were properly considered by the lower court as costs of operating the well, to be included with the other

operating expenses in determining whether the well was producing in paying quantities.

Coal Oil argues that the well made a profit if one looks to the entire 74-month period reviewed. However, revenues over the 74-month period total $107,233.20 while expenses equaled $121,698.36,[3] according to Coal Oil's own brief. Coal Oil's attempt to construct a nonexistent profit simply relies upon ignoring the "extraordinary" costs contended for by Coal Oil. Coal Oil *neither* capitalizes *nor* expenses these costs in its argument. Rather, it totally *ignores* them and leaves them totally out of the calculation. It is only through this stratagem and by requiring an unprecedently long seven-year period that Coal Oil is able to construct an argument that the lease did not terminate.

The trial court's ruling that the lease had terminated on the basis of both the 18-month and 51-month periods of nonproduction is supported by substantial evidence and is correct based on both the facts and the applicable law.

### DISPOSITION

The judgment is affirmed. Costs of appeal are awarded to respondent.

Lillie, P. J., and Johnson, J., concurred.

---

[3] According to appellant's brief, the expenses were as follows:

| | |
|---|---|
| Stipulated expenses | $ 43,693.00 |
| Daily operation expenses | 15,533.83 |
| Reperforation expenses | 41,024.89* |
| Royalties to Lough | 21,446.64 |
| | $121,698.36 |

---

*We are cognizant of Coal Oil's contention that reperforation expenses are "extraordinary"; however, we have affirmed the trial court's implied finding that such expenses are "ordinary."