Filed 11/20/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

|  |  |
|---|---|
| GARY D. LEIPER, as Trustee, etc., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> DENNIS GALLEGOS, <br><br> Defendant and Appellant; <br><br> JOHN L. POOLE et al., <br><br> Objectors and Respondents. | 2d Civil No. B292905 <br> (Super. Ct. No. P073688) <br> (Ventura County) |

A tax sale of real property described in the deed as pertaining to surface rights does not include oil and gas rights which are "restrictions of record" in a previously recorded oil and gas lease.

In 1939, Mr. E.S. Barnard, believed there was oil and gas under a 2.3 acre lot he owned near the Ventura River, Lot 7. He entered into a lease with a major oil company to drill for oil and

gas. Mr. Barnard was prescient. For 80 years, it has been a steady and reliable source of oil with no end in sight.

About 20 years later, Mr. Barnard conveyed fractional interests in the oil and gas royalties to family members. Another 20 years later, one of the fractional owners either did not care, or was not paying attention to a $12.78 tax bill on the surface rights to Lot 7. Upon default, the County of Ventura sold it to the state of California. The state then sold Lot 7 to Mr. and Mrs. Joseph Gallegos for $3000. The tax deed to the Gallegoses was silent on oil and gas. Their son, Dennis, appellant, somehow got the idea that he owned the oil and gas under Lot 7.[1]

The trial court ruled, and we agree that appellant is the surface owner to Lot 7 but he does not now own an interest in the oil and gas under Lot. 7.

Dennis Gallegos appeals a quiet title judgment that a tax deed for the sale of Lot 7 did not convey the right to receive royalties on a 1939 oil and gas lease. The judgment states that appellant has no interest in the oil and gas royalties from Lot 7. Appellant claims that the trial court "got it wrong" and "threw up its hands and deferred entirely" to the referee's findings and recommendations. That did not happen. We affirm but modify the judgment to show that upon termination of the oil and gas lease, any remaining oil and gas rights described in the 1939 Memorandum of Oil and Gas Lease revert to the surface owner. (Code Civ. Proc. § 43; *American Enterprise, Inc. v. Van Winkle* (1952) 39 Cal.2d 210, 219.)

*Facts and Procedural History*

---

[1] Appellant and his parents "sat" on the claimed oil and gas rights for 35 years.

Lot 7, also known as assessor's Parcel 045, lies in the Ventura Avenue Field, the tenth largest producing oil field in California, < https://en.wikipedia.org/wiki/ Ventura_Oil_Field [as of Oct. 1, 2019], archived at <https:// perma.cc/5DDX-A5GC>.  In 1939, fee simple owner E. S. Barnard Company entered into an oil and gas lease with British-American Oil Producing Company that was recorded.  The lease required that British-American and successor lessees pay oil royalties to the lessor.

In 1957, E. S. Barnard Company, a family company, dissolved and conveyed its interests in Lot 7, including the oil and gas lease, to its shareholders (the Barnards and Pooles; hereafter, fractional owners).  In 1977, the fractional owners entered into an agency agreement titled "Barnard Oil Trust – Hartman – Barnard Leases" (Barnard Oil Trust) for the distribution of oil and gas royalties.

*1978 Tax Sale*

The Ventura County Tax Assessor assessed Lot 7 using two assessor parcel numbers:  APN 063-9-190-024 and APN 063-0-190-045.  The 1971-1972 tax assessment roll for APN 063-9-190-024 listed a $14,775 valuation for "LAND Assessed Value of Real Estate and Mineral Rights Except Improvements."  The APN 063-9-190-024 tax bill was mailed to Gulf Oil Corporation, the successor lessee.  The tax assessment roll for APN 063-0-190-045 listed a $100 valuation for "LAND Assessed Value of Real Estate and Mineral Rights Except Improvements."  The $12.78 tax bill for APN 063-0-190-045 was mailed to "Barnard HA Attn Barnard Austin M" in Long Beach.[2]

---

[2] H.A. Barnard was the Secretary of the E.S. Barnard Company and co-signed the Corporation Grant Deed conveying the oil and gas lease to the fractional owners, which included

3

After Austin M. Barnard "defaulted" on the $12.78 tax bill, Ventura County Tax Collector sold Lot 7 to the State of California for $12.78.  The Conveyance of Real Estate described the property as APN 063-0-190-045 but was silent on mineral rights.  On February 10, 1978, State of California sold Lot 7 at a public auction to appellant's parents, Joseph and Ruby Gallegos for $3,000.  The tax deed described the property as APN 063-0-190-045.  After Joe Gallegos died, Ruby Gallegos deeded Lot 7 to appellant.

*Petition to Quiet Title; Oil Lease Royalties Interpleaded*

In 2014 appellant received a letter from the successor lessee, Aera Energy LLC (Aera), describing the extent, timing, and location of the oil extraction operation.  (Civ. Code, § 848.)  Responding to the letter, appellant claimed that Aera "was potentially trespassing and drilling on his property . . . ."  Appellant further claimed that he was entitled to 5.714 percent of the royalties, representing H.A. Barnard's fractional interest.  This caused Aera to suspend distribution of the oil royalties.  Appellant tentatively settled the dispute with Gary Leiper, trustee of the Barnard Oil Trust.  The proposed agreement provided that appellant would receive $12,000, plus 5.714 percent of the impounded royalties and future royalties.  But the proposed settlement agreement required approval by the Ventura County Superior Court.  Trustee filed a petition to confirm the

Austin M. Barnard (an undivided 70/420th fractional interest owner) at a Santa Monica address.  The APN 063-0-190-045 tax bill was mailed to the same Santa Monica address.  Appellant concedes that H.A. Barnard probably received the 1971-1972 tax bill on behalf of E. S. Barnard Company.

4

"trust assets" in accordance with the settlement agreement. (Prob. Code, § 850.)[3]

Aera filed a cross-petition to interplead the oil royalties ($177,000+) and deposited the money with the trial court. John L. Poole, a Barnard Oil Trust fractional owner, objected to the settlement agreement and filed a petition to determine title and royalty rights.

Because there were so many conflicting claims, the trial court declined to approve the proposed settlement agreement and ordered Leiper to file a petition for quiet title and declaratory relief. Appellant, in response to the petition, asked the trial court to confirm his fee simple ownership in the oil and gas royalties based on the theory that the 1978 tax deed conveyed both the surface rights and subsurface oil and gas rights.

*Gas and Oil Title Expert Appointed*

The trial court declared the case a complex action and appointed J. Nile Kinney, an attorney and recognized expert on oil and gas. He was ordered to act as a referee upon the parties' agreement. (Code Civ. Proc., § 638.) Kinney was directed to make findings and recommendations based on a series of questions which asked, inter alia, who owned the surface and mineral estates prior to the $12.78 tax sale in 1972, the legal effect of the tax deed on ownership of fee title to Lot 7, and "what particular interest in the Property (including fee mineral rights, if any) was conveyed by the State of California . . . to [appellant's parents] by way of the certain [tax] deed dated February 10, 1978?"

---

[3] The trial court found that the Barnard Oil Trust was not a trust, but merely an agent to distribute the oil royalties.

5

Kinney submitted his findings and recommendations which were adverse to appellant's claims. In Superior Court, appellant claimed that he was the sole owner of the oil and gas royalties interplead with the court, the subsurface mineral estate, and the "reversionary rights as well as all rights under the oil and gas lease . . . including the right to receive royalties therefrom." The trial court adopted a portion of the referee's findings and recommendations on issues that were dispositive of appellant's claim. It expressly ruled that appellant had no interest in the oil and gas royalties because the tax collector "didn't foreclose upon those rights."

*The Oil and Gas Lease - a Taxable Possessory Interest*

The tax sale of oil field property presents unusual title problems because a gas and oil leasehold is not "real property" or "real estate" but an estate in land measured in terms of duration. (Civ. Code, § 761; 4 Miller & Starr, Cal. Real Estate (4th ed. 2019) § 12.1, p. 12.3; *Callahan v. Martin* (1935) 3 Cal.2d 110, 118 (*Callahan*).) In *Callahan* our Supreme Court "took the position . . . that the lessee under an oil and gas lease 'has an interest or estate in real property in the nature of a *profit* [*à*] *prendre*, which is an incorporeal hereditament . . . .' [Citation.] In essence, the courts now recognize that the owner of land does not have title to the oil and gas which may underlie his property; instead he has the exclusive right on his premises to drill for oil and gas and to retain as his property all substances brought to the surface. [Citation.] When this interest is transferred to a lessee the lessee obtains a *profit* [*à*] *prendre*. [Citation.]" (*Lynch*

6

*v. State Board of Equalization* (1985) 164 Cal.App.3d 94, 102 (*Lynch*), first italics added.)[4]

Simply stated, an oil and gas lease is a taxable possessory interest because the lease is a servitude on the land and a chattel real at common law. (Civ. Code, §§ 801, subd. 5, 802, subd. 6; *Graciosa Oil Co. v. County of Santa Barbara* (1909) 155 Cal.140, 144 (*Graciosa Oil Co.*); see Cal. Code Regs, tit. 18, subd. (a), § 468, p. 43 [the right to remove petroleum and natural gas from the earth is a taxable real property interest].) "'[T]he cardinal feature of a taxable possessory interest is that it is an interest of finite duration. At some future date, the interest of the . . . possessor will terminate, and possession of the property will revert to the [fee title] owner.' [Citation.]" (*California State Teachers' Retirement System v. County of Los Angeles* (2013) 216 Cal.App.4th 41, 57.) "In *Graciosa Oil Co. v. County of Santa Barbara, supra,* 155 Cal. at pages 144 to 146, it was contended that the assessment of land to the landowner included all interests, including the interest of an oil and gas lessee, and that the interest under the oil and gas lease could not be separately assessed. The Supreme Court rejected this contention and held that the mining rights and privileges of the lessee should be separately assessed to the lessee. [Citation.]" (*Lynch, supra,* 164 Cal.App.3d at p. 103.)

Appellant claims that the fractional owners lost their right to receive oil royalties after Lot 7 was sold at the tax sale. The

---

[4] "The incorporeal hereditament of common is defined by Blackstone as 'being a profit which a man hath in the land of another; as to feed his beasts, to catch fish, to dig turf, to cut wood, or the like'. [Citation.] These are the rights which are described as *profits* [*à*] *prendre* . . . ." (*Callahan, supra,* 3 Cal.2d at p. 120, first italics added.)

7

argument is based on the theory that the tax deed conveyed fee simple title to all subsurface mineral rights even though the tax deed makes no mention of mineral rights or the oil and gas lease. In construing the tax deed we are guided by the principle that a tax assessor can only sell what has been assessed. (See, e.g., *Nevada Irrigation Dist. v. Keystone Copper Corp.* (1964) 224 Cal.App.2d 523, 529-530 (*Nevada Irrigation Dist.*); *Lough v. Coal Oil* (1990) 217 Cal.App.3d 1518, 1527 (*Lough*) ["state could not foreclose on any greater interest than that upon which taxes had not been paid"]; *Helvey v. Sax* (1951) 38 Cal.2d 21, 24 (*Helvey*) [property tax operates in rem against the property interest being taxed].) Nor does surplus language in the tax deed property description expand or contract the right of the lessee when the oil field surface rights are sold for the nonpayment of taxes. (*Lough, supra,* at pp. 1521, 1528 [tax deed stating property was sold "ex of mining rights" did not change or affect oil lease].)

 The trial asked: "What's being taxed?" Was the tax assessment on the surface rights or the mineral rights or both? The question is pivotal but fraught with problems because it suggests that "mineral rights" and leasehold oil and gas rights are the same thing in determining what the tax deed conveyed. The "Supplemental Final Decision of Referee" filed with the trial court states: "we must assume that for the portion of the Property separately assessed as APN 063-0-190-045, the Ventura County Tax Assessor did not assess, and levy taxes upon, *any mineral interest* - whether leasehold (*profit* [*à*] *prendre*), mineral royalty interest *or reversionary interest* (an interest in <u>future</u> possession)." (Italics added.) That is erroneous.

8

The trial court found that the state "didn't foreclose" on the leasehold estate, but the tax deed did convey the lease reversionary interest.

The controversy over what the tax deed means brings to mind the Indian fable of the blind men and the elephant.[5] It begins and ends by looking at what mineral rights are described in the oil and gas lease. Here, the recorded lease grants the lessee the right to explore, mine, drill, and "operat[e] for oil, gas and other hydrocarbon substances . . . ." The oil and gas royalties are a large part of the elephant but the elephant has other parts, including other mineral rights (silver, gold, uranium?) not described in the oil and gas lease. A tax deed "conveys not merely the title of the person assessed, but a new and complete title under an independent grant from the state. [Citations.]" (*Helvey*, *supra*, 38 Cal.2d at p. 24.) "A purchaser at the tax sale may thus receive a better title than that of the person against whom the taxes were assessed, unless he is the defaulting taxpayer or someone acting in his behalf. [Citation.]" (*Ibid.*)

*A Tax Deed Subject to Restrictions of Record*

Revenue and Taxation Code section 3712, subdivision (d) provides that a tax deed conveys title free of all encumbrances

---

[5] The poet John Godfrey Saxe, in "The Blind Men and the Elephant" described the fable as follows:

"And so these men of Indostan
Disputed loud and long,
Each in his own opinion
Exceeding stiff and strong,
Though each was partly in the right,
And all were in the wrong!" (*United States v. Sanchez* (2d Cir. 1992) 969 F.2d 1409, 1411 & fn 1.)

except for, among other things, easements, water rights, "restrictions of record," and certain tax liens or special assessments. The trial court impliedly found that the 1939 oil and gas lease was a restriction of record and the oil and gas leasehold interest was not intended to be sold at the tax sale.

"A taxing agency which has had no intent to assess mineral estates does not assess them even though the unmeant description of lands on the assessment book may be broad enough to include such interests. If, intending to assess only the surface estate, it unwittingly drafts a description broad enough to cover both surface and subsurface estates, the inclusion of the latter is a mistake and it cannot be permitted to reach for tax purpose an estate it never sought. . . . [T]he problem is not appreciably different from that existing where a taxing agency mistakenly doubly assesses land, so that a nondelinquent tract is also included in a larger parcel owned by another who allows his taxes to become delinquent. The rule in such cases is well settled that the tax deed conveys no title to the nondelinquent land . . . ." (*Nevada Irrigation Dist.*, *supra*, 224 Cal.App.2d at p. 529.) In the words of the trial court, "What's being taxed?"

*Two Tax Assessments – Different Property Interests*

The Ventura County Tax Assessor maintained two tax assessment rolls (i.e., two APNs) on Lot 7.[6] Substantial evidence supports the finding that the APN 063-0-190-045 tax assessment ($100) was for the surface rights and mineral rights not described in the oil and gas lease. When E.S. Barnard Company defaulted on the APN 063-0-190-045 tax bill, the Lot 7 surface rights and

---

[6] Pursuant to appellant's request, we have taken judicial notice of the 1971-1972 assessment rolls for APN 063-0-190-045 and APN 063-9-190-024.

mineral rights not described in the oil and gas lease were sold to the State for $12.78. The conveyance described the property as APN 063-0-190-045 (the parties call it Parcel 045) which was sold to appellant's parents for $3,000.

Appellant argues that the subsurface mineral rights were severed by the tax deed and conveyed to his parents in fee simple, but that is not what happened. Appellant's parents took title to Lot 7 subject to the oil and gas lease. The referee explained "[w]hen the owner of mineral rights enters into an oil and gas lease, the owner conveys the *profit* [*à*] *prendre* to the mineral lessee, for a prescribed period of time. [Citation.] In return, the lessor is paid royalties and rents, which are likewise incorporeal hereditaments and interests in land. [Citation.]" The referee found that "no portion of the surface fee estate was ever severed from any portion of the mineral fee estate prior to June 30, 1972," the date the property was sold to the State of California for nonpayment of the APN 063-0-190-045 taxes.

That is consistent with California case law (*Callahan*, *supra*, 3 Cal.2d at page 118 [oil and gas lease for term of years and so long as oil is produced in paying quantities is a *profit à prendre*])[7] and Revenue and Taxation Code section 3712,

_____

[7] In California, an oil and gas lease with a "so long thereafter" habendum clause creates a determinable fee interest in the nature of *profit à prendre*, an interest that terminates upon the happening of the specified event with no notice required. (*Renner v. Huntington-Hawthorne Oil & Gas Co.* (1952) 39 Cal.2d 93, 98.) Here, the lease term was for twenty years and "so long thereafter as oil, gas, casinghead gas and other hydro-carbon substances, or either or any of them, may be produced therefrom in quantities deemed by lessee sufficient to pay to pump or otherwise secure and save." (See, e.g., *Lough*, *supra*, 217

11

subdivision (d) which in 1978, provided that a tax deed conveys title free of all encumbrances *except* easements, water rights, and "restrictions of record." *Profits à prendre*, like easements, are treated as incorporeal hereditaments. (*Gerhard v. Stephens* (1968) 68 Cal.2d 864, 880 (*Gerhard*).) A fair reading of Revenue and Taxation Code 3712, subdivision (d) is that a recorded oil and gas lease is a "restriction of record" and excepted from the tax deed in determining the title conveyed.

The oil and gas lease is also an easement because an oil and gas lease is a *profits à prendre*, which is a non-possessory interest in land. (*Gerhard, supra,* 68 Cal.2d at pp. 880-881 [the term easement includes profit].) A profit is simply a type of easement. (12 Witkin, Summary of Cal. Law, Real Property (2d ed. 2017) § 401, p. 460 [Civ. Code sections 801-802 make no distinction between profits and easements].) Easements, including profits, come within the definition of real, not personal, property (Black's Law Dictionary (11th ed. 2019) at p. 147), and clearly fall within the "[e]asements of any kind" exception of Revenue and Taxation Code section 3712, subdivision (d).

Appellant contends that the tax deed conveyed all the subsurface mineral rights because the 1971-1972 assessment for APN 063-0-190-045 shows a $100 assessment for "LAND Assessed Value of Real Estate and Mineral Rights Except Improvements." However, the APN 063-0-190-024 tax roll lists $14,775 for "LAND Assessed Value of Real Estate and Mineral Rights Except Improvements." That would be the tax assessment

_____

Cal.App.3d at p. 1528 [oil and gas lease remained in effect until such time as oil and gas is no longer produced in "paying quantities"].)

12

for the oil and gas leasehold which was producing more than $100,000 annually.[8]

APN 063-0-190-045 was a $100 tax assessment for vacant river bottom land (the surface rights), and undeveloped mineral rights not described in the oil and gas lease. If the APN 063-0-190-045 tax assessment was intended to include leasehold oil and gas rights, the assessed valuation would have been thousands of times greater than $100. The referee explained that "[t]he APN digit codes [i.e., APN 063-0-190-045 and APN 063-9-190-024] used by the Ventura County Assessor reflect this interpretation. The APN digit key . . . contains ten categories of interest, denominated by the *tenth – ie. last –* digit in the number. The number '5' refers to 'Surface Except all or part mineral.' The number '4' refers to 'Mineral int. only.'"

Based on appellant's construction of the tax deed (i.e., that it conveyed fee simple ownership to the oil and gas royalties), one would have to assume that a double tax assessment was made on the same oil and gas rights. But that would "'fling a plank of hypothesis over an abyss of uncertainty'" (*Gradus v. Hanson Aviation, Inc.* (1984) 158 Cal.App.3d 1038, 1056) and render the tax deed void with respect to the oil and gas rights. (See, e.g., *Nevada Irrigation Dist.*, *supra*, 224 Cal.App.2d at p. 530; *Nutting v. Herman Timber Co.* (1963) 214 Cal.App.2d 650, 656 [erroneous double taxation of 40 acre parcel that was adjacent to 1,400 acre parcel sold at tax sale].) "[T]ax deeds which are the product of

---

[8] We presume that since tax on the oil and gas leasehold was not foreclosed, that the taxes were paid by E.S. Barnard, his successors, or the oil companies who own the oil and gas lease. Carried to its illogical conclusion, appellant is the owner of the oil and gas leasehold, without having paid the taxes, since 1978. This would be quite a windfall.

sales of doubly-assessed lands cannot be reached by either curative acts or general or special statutes of limitation.  To attempt to apply either would constitute confiscation."  (*Ibid.*)

Two APN numbers were used to assess Lot 7, and it is presumed that the leasehold oil and gas rights were not double-taxed.  (See Rev. & Tax. Code, § 3712; Evid. Code, § 664 [presumption that official duty has been regularly performed].)  It is also presumed that the tax assessor assessed all the Lot 7 property interests, including the oil and gas leasehold, at full cash value.[9]  (Rev. & Tax. Code, § 401; *Graciosa Oil Co.*, *supra*, 155 Cal. at pp. 144-145.)  *"The general rule is that there can be but one assessment of the entire estate in real property*, which assessment includes the value of both the estate for years and the remainder or reversion, and the mortgagor or lessor of the real estate is liable for the taxes thereon.  [Citations.]"  (*Tilden v. County of Orange* (1949) 89 Cal.App.2d 586, 587, italics added.)  Although a leasehold is not "real property" or "real estate," it is an estate in land and subject to property taxes as an estate in real property.  (Civ. Code, § 761; *Callahan*, *supra*, 3 Cal.2d at p. 118.)

The tax assessment rolls, the use of two APN numbers to tax different property interests, and the APN 063-0-190-045 property description in the tax deed support the finding that the

---

[9] "The right to mine and extract minerals from real property may have a value to its holder far in excess of the value of the surface uses.  [Citation.]  The taxable nature of such an interest has long been settled.  The conveyance of a mineral interest in land, it has been held, creates two separate estates in the land, each of which is subject to taxation and thus may be separately taxed.  [Citations.]"  (*Howard v. County of Amador* (1990) 220 Cal.App.3d 962, 973.)

14

tax deed did not convey the leasehold oil and gas rights. As one court explained: it would be "unconscionable to divest the owner of title to his subsurface estate and transfer such ownership to [appellant] through the hocus-pocus of an inadvertent inexactness of description" in the tax deed. (*Nevada Irrigation Dist.*, *supra*, 224 Cal.App.2d at p. 529.) "Equally confiscatory would be an attempt to give vitality, as against the owner of a mineral estate, to a deed derived from tax proceeding aimed only at the separate and severable surface estate." (*Id.* at p. 530.)

*Reversionary Interest in Leasehold Mineral Rights – How Many Angels Dance on the Head of a Pin?*

Appellant argues that the trial court erred in finding that the Barnard Oil Trust beneficiaries were fee owners of the leasehold mineral rights and that appellant has no reversionary rights. (See *Dabney-Johnston Oil Corp. v. Walden* (1935) 4 Cal.2d 637 [lessor of oil rights has a reversionary interest in the right to drill for and produce oil, dependent upon the termination of the lease].) That was not the trial court's ruling nor did the trial court say it was adopting the referee's findings in toto. The trial court found that the mineral revisionary right "isn't a part" of the oil and gas lease and that the oil and gas rights revert back to the surface owner and his/her successors "after oil and gas is no longer being produced in payable quantities." "Once this lease can no longer produce in payable quantities, who gets the revisionary right? . . . There's nothing – there's nothing to drill for. [¶] . . . [B]ut if you want to . . . count angels dancing on the head of a pin, go right ahead and litigate it to the Court of Appeal [or] the Supreme Court."

Like the trial court, we presume there is some reversionary oil and gas right after the oil is pumped dry. (See *Collins v.*

15

*Chappell* (Okla. 1958) 333 P.2d 578, 583 ["'One who purchases all or a portion of a lessor's reversionary interest in the oil and gas in the land, acquires no interest in the production under an existing lease and can only hope that the present lease will terminate before the minerals in the land are exhausted,'" (Quoting 3A Summers, Oil & Gas (Perm. ed. 1958) at p. 311)].)  That is consistent with Civil Code section 761 which provides the lessee has a present possessory interest in the property, while the lessor has a future reversionary interest and fee title.  (See, e.g., *Avalon Pacific-Santa Ana, L.P. v. HD Supply Repair & Remodel, LLC* (2011) 192 Cal.App.4th 1183, 1189-1190.)

Appellant, in his opening brief, concedes that the trial court "acknowledged that [appellant] owned 100% of Parcel 045 and the reversionary rights at the end of the Lease."  That is a fair statement of the trial court's order and requires no further elaboration, but in the exercise of caution, the judgment should be clarified.

*Disposition*

The trial court is directed to amend the judgment to provide that upon termination of the oil and gas lease, the oil and gas and hydrocarbon rights described in the 1939 Barnard-British-American Memorandum of Oil and Gas Lease revert to the surface owner.  (Code Civ. Proc. § 43.)  As modified, the judgment is affirmed.  Respondents are to recover costs on appeal.

CERTIFIED FOR PUBLICATION.


YEGAN, J.

We concur:


GILBERT, P. J.                          PERREN, J.


16

Glen Reiser, Judge

Superior Court County of Ventura

_____

Law Offices of Greg May and Grey May; Jones & Lester; Jones, Lester, Schuck, Becker & Dehesa, Mark A. Lester and Theresa Loss; Norman Dowler and Brett L. Price for Defendant and Appellant Dennis R. Gallegos.

Musick, Peeler & Garrett and Cheryl A. Orr for Respondent Bank of the West, co-trustee for Austin M. Barnard, deceased.

John L. Poole, in propria persona, Respondent.

No appearance for Plaintiff, Gary D. Leiper as Trustee.